978 A.2d 804

**Kevin OYARZO**

**v.**

**MARYLAND DEPARTMENT OF HEALTH AND MENTAL HYGIENE, et al.**

**No. 1515, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Aug. 26, 2009.

266

Paul Walter (Thomas M. Wilson, III, Tydings & Rosenberg, LLP, on brief), Baltimore, for Appellant.

Lisa A. Barkan (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: MEREDITH, ZARNOCH and JAMES A. KENNEY, III, (Retired, specially assigned), JJ.

MEREDITH, J.

In common parlance, Kevin Oyarzo, the appellant, might be referred to as a dairy farmer. When a dairy farmer provides services such as boarding and milking a herd of dairy cows owned by others, he acts as an agister and provides agistment services. The term "agister" is defined in BLACK'S LAW DICTIO-NARY (8th ed.2004) at 73 as: "One who takes and pastures grazing animals for a fee; a person engaged in the business of agistment. An agister is a type of bailee for hire. Also spelled *agistor*." Similarly, "agistment" is defined as: "A type of bailment in which a person, for a fee, allows animals to graze on his or her pasture; the taking in of cattle or other livestock to feed at a per-animal rate." *Id.*

Oyarzo wished to offer agistment services to people who might want to own a fractional interest in a herd of dairy cattle. The belief that there is an unmet demand for such services is based upon the fact that there are persons who wish to drink raw milk (rather than pasteurized milk), and in Maryland, it is illegal to sell raw milk to consumers. Maryland Code (1982, 2000 Repl.Vol., 2008 Supp.), Health–General Article ("HG"), § 21–434 ("Except for sale of raw milk by a holder of a milk producer permit to a holder of a milk processor permit, a person may not sell raw milk for human consumption."). But it is not illegal in Maryland for an owner of cows to drink the raw milk those cows produce. Oyarzo's plan was to sell fractional ownership interests in a herd of dairy cattle, after which he would board and care for the cows, and then provide the raw milk produced by those cows to the

owners of the herd in accordance with their percentages of ownership.

Oyarzo sought a declaratory judgment in the Circuit Court for Frederick County to confirm that the proposed contract for cattle syndication and agistment services he wanted to offer was not in violation of the Maryland laws governing the sale of raw milk. Oyarzo also asked the court to declare unenforceable a regulation that had been promulgated by the Secretary of the Maryland Department of Health and Mental Hygiene ("the Department"), appellee, purporting to preclude Oyarzo and others from offering such services.

The circuit court ruled contrary to Oyarzo's requests; it declared that COMAR 10.15.06.06(F)(1), as amended August 1, 2006, does preclude him from entering into the proposed cow-sharing agreement, and further, that that regulation does not exceed the authority given to the Maryland Department of Health and Mental Hygiene to carry out the statutory prohibition on the sale of unpasteurized milk in this State.

Oyarzo appealed and presents the following issues for our review:

1. Whether the trial court erred by construing the Act as conferring on the Secretary the regulatory power to define the unambiguous words "sale" and "sell" in a way that "adds to, extends, or enlarges ... the [A]ct being administered"[.]

2. Whether the trial court erred by construing the Agreement as one in which the syndicated owners of the herd acquire, by a "transfer for consideration" (i.e., by a "sale"), title to the raw milk that they already own[.]

3. Whether the trial court erred by *sua sponte* dismissing Count II as having been mooted by the dismissal of Count I[.]

We agree with Oyarzo that: (a) it is not illegal in Maryland for the owner of a dairy cow to drink the raw milk which that cow produces; (b) it is not illegal in Maryland to sell a fractional interest in a herd of dairy cattle; and (c) it is not illegal in Maryland for an agister to provide agistment services by boarding and caring for dairy cows owned by others.

Nevertheless, we agree with the Department that the transactions proposed by Oyarzo, pursuant to which persons who wish to consume raw milk pay him fees and he provides them unpasteurized milk as long as they pay the fees, is a transaction within the scope of the Department's regulatory purview. Accordingly, the August 2006 amendment to COMAR 10.15.06.06(F)(1) was a permissible exercise of the authority of the Department to regulate transactions involving the distribution of milk in Maryland. Therefore, we answer Oyarzo's first two questions "no." We agree with Oyarzo, however, that his second count, challenging the delegation of legislative power as unconstitutional, was not moot. We shall remand the case for further proceedings consistent with this opinion.

## Facts and Procedural History

Kevin Oyarzo is a farmer residing in Buckeystown, Maryland, in Frederick County. He wishes to market fractional ownership interests in a herd of dairy cattle for which he would provide agistment services. Oyarzo's counsel drafted a proposed "Bovine Sale and Agistment Agreement" that would permit individuals to purchase a percentage ownership interest in a herd. The agreement also calls for Oyarzo to act as the agister; *i.e.,* the agreement specifies that Oyarzo would board and care for the herd, and would milk the cows. The proposed agreement provides that the fractional owners would be "entitled to receive the [herd's] production [ (*i.e.,* raw milk) ]" in proportion to their ownership interest in the herd.

Because HG § 21–434 prohibits the sale of raw milk for human consumption, except for transactions in which the seller has a milk producer permit and the buyer has a milk processor permit, Oyarzo contacted the Department in 2006, requesting advance approval of his proposed agreement. The Department is the agency tasked with enforcing the milk statute. HG § 21–406 states: "The Secretary [of the Department] shall adopt rules and regulations to carry out the provisions of this subtitle [*i.e.,* HG Title 21 ('Food, Drugs, and Cosmetics'), Subtitle 4 ('Milk Products'), herein sometimes referred to as 'the milk statute']."

After reviewing Oyarzo's request, the Department not only declined to approve the proposed agreement, but the Department also promulgated COMAR 10.15.06.06(F)(1), effective August 28, 2006, as an "emergency" measure in order to "resolve current ambiguity regarding whether cow-sharing or agistment arrangements, whereby the investor buys a share in a cow or cows, or provides funding to feed or care for a cow or cows, and obtains raw milk in return, are included in [the] prohibition [of HG § 21–434]." 33 Md. Reg. 809 (April 28, 2006). The regulation purported to redefine the terms "sale" and "sell" in the context of transactions that involve the right to acquire raw milk. As amended in August 2006, COMAR 10.15.06.06F provides:

F. Sale of Raw Milk.

(1) In this section, "sale" or "sell" means a transaction that involves the:

(a) Transfer or dispensing of milk and milk products; or

(b) Right to acquire milk and milk products:

(i) Through barter or contractual arrangement; or

(ii) In exchange for any other form of compensation including, but not limited to, an agistment agreement, which is the sale of shares or interest in a cow, goat, or other lactating hooved mammal or herd of cows, goats, or other lactating hooved mammals.

\* \* \*

(4) Except [for a sale by a milk producer to a milk processor, receiving station or transfer station], a person may not sell raw milk or raw milk products for human consumption.

According to the statement of purpose published in the Maryland Register, this broadened definition of the statute's words "sale" and "sell" was intended to "prevent [cow-sharing or agistment] arrangements from being utilized to circumvent the existing prohibition on the sale of raw milk for direct human consumption." 33 Md. Reg. 809.

In response to the action of the Department, Oyarzo filed a complaint in the Circuit Court for Frederick County, requesting (a) a declaratory judgment that the new regulation is invalid as and if applied to his proposed Bovine Sale and Agistment Agreement, and (b) an injunction preventing enforcement of the new regulation. The defendants, now appellees, were the Department; S. Anthony McCann, in his capacity as the Secretary of the Department; the Milk Control Division of the Department; and Theodore Elkin, in his capacity as the Chief of the Milk Control Division. Count one of the complaint alleged that the regulation exceeds the authority that was delegated to the Department by the General Assembly when it enacted the milk statute, HG §§ 21–401 through 21–436. Count two alleged, in the alternative, that "if in enacting § 21–406 of the Act the General Assembly somehow purported actually to authorize the Secretary to adopt regulations that change the meanings of 'milk products,' 'sale,' and 'agistment,' as described in" COMAR 10.15.06.06F(1), as amended in August 2006, then the statute is an unconstitutional delegation of legislative power in violation of Article 8 of the Maryland Declaration of Rights.

Oyarzo and the defendants filed cross-motions for partial summary judgment, with accompanying affidavits, requesting summary judgment as to Count one. The circuit court held a hearing on the motions, and then issued a written opinion and order that (1) denied Oyarzo's motion for summary judgment as to Count one, (2) granted the defendants' motion for summary judgment as to that count, and (3) dismissed Count two as moot. Oyarzo timely noted this appeal.

## Analysis

### A. Justiciability

As a preliminary matter, the appellees have raised an issue as to the justiciability of Oyarzo's claims, noting that Oyarzo's proposed contract is incomplete because it does not contain a price term or the number of cows, and further noting that Oyarzo has not yet identified specific parties willing to enter

into the contract. As a result, appellees contend, the dispute between Oyarzo and the Department—over whether the new regulation precludes him from entering into such a contract—is not ripe for disposition.

 Maryland Code (1973, 2006 Repl.Vol.), Courts and Judicial Proceedings Article ("CJP"), § 3–409(a), permits a court, in the absence of certain exceptions not applicable here, to:

> grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:
>
> (1) An actual controversy exists between contending parties;
>
> (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or
>
> (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

"[T]he Maryland version of the Uniform Declaratory Judgments Act ... is remedial ... [and] 'shall be liberally construed and administered.'" *Boyds Civic Ass'n v. Montgomery County Council*, 309 Md. 683, 688, 526 A.2d 598 (1987) (quoting CJP § 3–402).

 In addition, Maryland Code (1984, 2004 Repl.Vol.), State Government Article ("SG"), § 10–125(b), specifically permits a court to "determine the validity of any regulation [in a declaratory judgment action] if it appears to the court that the regulation or *its threatened application* interferes with or impairs or *threatens to interfere with* or impair a legal right or privilege of the petitioner." (Emphasis added.) This latter provision, cited by the circuit court as authority for considering Oyarzo's complaint, makes clear that a party is not required to wait until a regulation is enforced against it to seek a declaratory judgment that the regulation is invalid. *See Medstar Health v. Md. Health Care Commission*, 376 Md. 1, 17, 20, 827 A.2d 83 (2003).

■ Nevertheless, the controversy must be ripe for adjudication, because "the existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action." *Hatt v. Anderson*, 297 Md. 42, 45, 464 A.2d 1076 (1983). The Court of Appeals discussed the issue of ripeness in the context of a declaratory judgment action in *Hickory Point v. Anne Arundel County*, 316 Md. 118, 129–31, 557 A.2d 626 (1989), stating:

A controversy is ripe when "there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *See Boyds Civic Ass'n v. Montgomery County Council*, 309 Md. 683, 690, 526 A.2d 598, 601 (1987).... To address issues which are non-justiciable because they are not ripe "would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State." *Hatt v. Anderson*, 297 Md. 42, 46, 464 A.2d 1076, 1078 (1983).

"Generally, an action for declaratory relief lacks ripeness if it involves a request that the court declare the rights of parties upon a state of facts which has not yet arisen, [or] upon a matter which is future, contingent and uncertain." *Boyds Civic Ass'n*, 309 Md. at 690, 526 A.2d at 602....

The purpose of the ripeness doctrine "is to prevent premature judicial interference with government action and to avoid entanglement in abstract, poorly defined disputes. The mature, focused conflict not only affords the Court an informing perspective on the actual working or impact of laws, a view not available in the legislative process, but also provides the Court with greater choice among the grounds for decision, an opportunity thus to decide in the narrowest compass." Albert, *Justiciability and Theories of Judicial Review: A Remote Relationship*, 50 S.Cal.L.Rev. 1139, 1155 (1977). "The disagreement" over which declaratory relief is sought "must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved

in deciding them." *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291, 296 (1952).

In *Hickory Point*, the parties sought a declaration of what the homeowners' rights would be in the event that the rest of the planned subdivision was built in such a way as to conflict with the restrictive covenants in the existing homeowners' deeds. *Id.* at 121, 129, 557 A.2d 626. Because a new subdivision plan had not yet been approved, it was unclear if the potential conflict would ever actually occur, and the Court held that the issue was not ripe. *Id.*

The Court distinguished the controversy that was not ripe in *Hickory Point* from the issue that was held to be ripe in *Boyds Civic Ass'n, supra.* In *Boyds Civic Ass'n,* 309 Md. at 697, 526 A.2d 598, the Court explained why the controversy before it was ripe:

[T]he challenged plan amendment was initiated, approved, and adopted in furtherance of an actual, pending application to amend the local zoning map. Moreover, the designation of an area on the applicable master plan as suitable for a Mineral Resource Recovery Zone was a condition precedent to the granting of an application for zoning of an area as a Mineral Resource Recovery Zone. In Count I of the complaint filed in the circuit court petitioners claimed that hearings—spanning some four days—on the application to amend the local zoning map would not have gone forward if the master plan had not been amended. In Count II petitioners alleged that the actions of the Commission and District Council with respect to the plan amendment forced petitioners to hire counsel and land consultants in order to participate in the local zoning map amendment proceedings. The prospect of a controversy, therefore, lay well beyond the realm of matters "future, contingent and uncertain." ... [T]his case presents a practical rather than a theoretical question.

*Accord County Commissioners of Queen Anne's County v. Days Cove Reclamation Co.*, 122 Md.App. 505, 517, 713 A.2d 351 (1998) ("the Court of Appeals in Boyds stated that, 'if a

court is satisfied that the "ripening seeds" of an actual controversy exist, the facts are not too contingent or speculative for declaratory relief.' 309 Md. at 691, 526 A.2d 598 (citation omitted).").

■ In the present case, the right Oyarzo seeks to protect is the right to pursue a business opportunity. He asserts that the challenged regulation restricts his right to pursue his chosen profession by prohibiting him from entering into the proposed syndication and agistment contract. The Department takes the position that the proposed contract violates the statutory prohibition on the sale of raw milk; indeed, the Department's regulation expanding the definition of "sale" was promulgated as a direct response to Oyarzo's proposal, and the new definition of "sale" and "sell" specifically mentions a right to acquire milk pursuant to an "agistment agreement." This is not a case in which the event triggering the controversy is remote and contingent. There is no need for Oyarzo to violate the challenged regulation in order for us to consider whether it was within the scope of the Department's authority to adopt the expanded definitions of "sale" and "sell." The controversy is present and existing, and is ripe for review.

## B. Standard of Review

This case comes to us following a grant of summary judgment. "Our standard of review of [a] declaratory judgment entered as the result of the grant of a motion for summary judgment is whether that declaration was correct as a matter of law." *South Easton v. Easton,* 387 Md. 468, 487, 876 A.2d 58 (2005) (citation omitted). Neither side contends that there is any genuine dispute of material facts. We review the legal issues *de novo.*

## C. The Raw Milk Versus Pasteurized Milk Controversy

In support of its motion for summary judgment, the Department filed an affidavit of Ted Elkin, the Chief of Milk Control for the State of Maryland. Elkin stated in his affidavit that he holds a Master of Science degree in Environmental Engineering, as well as a Master of Public Administration degree.

Elkin explained in his affidavit why the Department takes the position that raw milk is dangerous, noting: "Because of the dangers of raw milk, the federal government prohibits transporting raw milk across state lines." Elkin described some of the perceived dangers as follows:

8. Raw milk is inherently dangerous and may contain a whole host of pathogens including Enterotoxigenic *Staphylococcus aureus, Campylobacter jejuni (C. jejuni), Salmonella* species, *Escherichia coli (E. coli* 0157H:7, Enterohemorrhagic *E. coli*—EHEC, Enterotoxigenic *E. coli*—ETEC), *Listeria monocytogenes, Mycobacterium tuberculosis, Mycobacterium bovis (M.bovis), Brucella* species (*B. abortus* being mainly associated with cattle and *B. melitensis* being mainly associated with goats), *Coxiella burnetii* and *Yersinia enterocolitica* to name but a few. These organisms are potentially fatal to humans especially those with weakened immune systems such as children, the elderly, people who have had transplants or people who have cancer. These organisms can exist in milk even if a farmer keeps his or her farm in a fastidious condition because the cows themselves house bacteria including ecoli in and on their bodies.

\* \* \*

12. ... Pasteurization simply means that the milk is heated to a certain temperature for a period of time in order to destroy pathogenic organisms.... The pasteurization process does not kill all the pathogens but kills most of the pathogens so that they are incapable of reproducing to harmful levels. The pasteurization process does not destroy the beneficial properties of milk.... Because of the enormous and demonstrated benefits of pasteurization, Maryland law prohibits the sale of raw milk to a consumer.

13. There have been infectious outbreaks from drinking raw milk. In general, the Centers for Disease Control ("CDC") for the week of March 2, 2007 reported that from 1998 to May 2005, 45 outbreaks of food borne illness implicated unpasteurized milk, or cheese made from unpasteurized milk. Those outbreaks accounted for 1,007 illnesses,

104 hospitalizations, and two deaths. The CDC also noted that between 1973–1992, 87% of the milk outbreaks were attributed to raw milk and occurred in those states which allowed raw milk sales to consumers. Notably, in States that allowed sales of raw milk, raw milk sales constituted less than 1% of the total milk sold.

14. In particular, very recently the State of Washington and the FDA traced an outbreak of food borne illness caused by *E. coli* to raw milk distributed from a farm that engaged in "cow sharing" agreements. There were eighteen victims identified in that outbreak. Unfortunately, the median age of the victims was just 9 years. Five of these victims, aged between 1–13 years, were hospitalized and four of these unfortunate children had HUS [Hemolytic Uremic Syndrome]. Seventeen of the victims were farm "shareholders" or the children of "shareholders" and one other victim, a child of ten years of age, was a friend of a "shareholder." The Centers for Disease Control and Prevention (CDC) just issued, on March 2, 2007, a report on this outbreak in its Morbidity and Mortality Weekly Report (MMWR). Pasteurization would have killed the e. coli implicated in the outbreak.

The debate regarding the degree to which the increased health risks posed by raw milk, in comparison to pasteurized milk, outweigh the positive attributes that cause some consumers to prefer raw milk has been going on for at least thirty-five years. *See Public Citizen v. Heckler,* 653 F.Supp. 1229, 1231 (D.D.C.1986) (describing a 1973 regulation of the federal Food and Drug Administration that "in effect prohibited the sale of all unpasteurized milk in interstate commerce."). *See generally* Damian C. Adams, Michael T. Olexa, Tracey L. Owens & Joshua A. Cossey, *Deja Moo: Is the Return to Public Sale of Raw Milk Udder Nonsense?,* 13 DRAKE J. AGRIC. L. 305 (2008).

The *Public Citizen* litigation was initiated by several public interest organizations seeking to end a partial stay of the 1973 ban on interstate sales of raw milk. The ban had been stayed only as to "certified raw milk," which "is unpasteurized milk

produced by methods which comport with the standards established by the American Association of Medical Milk Commissions." 653 F.Supp. at 1232. The Secretary of Health and Human Services had refused to lift the partial stay. The United States District Court for the District of Columbia reviewed a variety of evidence before coming to the conclusion that "[i]t is undisputed that all types of raw milk are unsafe for human consumption and pose a significant health risk." *Id.* at 1241. In support of that conclusion, the court noted, *id.* at 1232:

> From 1974 to 1982 the FDA collected and evaluated scientific and medical information to determine if the outbreak of certain diseases was associated with the consumption of certified raw milk. The FDA worked closely with the Center for Disease Control ("CDC"), a branch of HHS, and encouraged the states to test milk and milk products for bacteria or microorganisms and to report outbreaks of milkborne disease to the CDC.
>
> The process of collecting and reviewing data and information led the FDA to conclude that the consumption of certified raw milk and all forms of raw milk and raw milk products was linked to the outbreak of serious disease.

(Footnote omitted.)

The court also pointed to the position of the CDC, stating, *id.* at 1233:

> [I]n May 1983, the Director of the Center for Disease Control stated that "because the accumulated evidence indicates that unpasteurized [raw] milk is inherently unsafe, the Center for Disease Control supports pasteurization of milk and other dairy products." The Director of CDC further indicated that CDC can conceive of no practical way raw milk can assuredly be safely marketed.

(Citations omitted.)

The court noted that "proponents of raw milk testified that raw milk offers nutritional benefits that are destroyed by pasteurization and that raw milk tastes better than pasteurized milk." *Id.* at 1234. Such contentions were outweighed, in

the view of the court, by evidence from the FDA and the CDC, as well as witnesses from the following organizations that contended "the risks associated with the consumption of raw milk, even certified raw milk, heavily outweigh any benefits from its consumption," *id.*:

The American Academy of Pediatrics, the National Association of State Departments of Agriculture, the Association of State and Territorial Health Officials, the United States Conference of Local Officials, the National Conference for Food Protection, the American Veterinarians Medical Association, the National Milk Producers Association, the National Conference on Interstate Milk Shipments, the Association of Food and Drug Officials, the National Dairy Counsel, the American Society for Microbiology, the Milk Industry Foundation, the Mid–American Dairymen's Association, and others, all supported the pasteurization requirement.

The court concluded: "The appropriate remedy in this case . . . is an order compelling the agency to promulgate a regulation prohibiting the interstate sale of certified raw milk and certified raw milk products, and non-certified raw milk and raw milk products." *Id.* at 1241.

In response to the order issued in the *Public Citizen* case, the FDA promulgated the regulation that appears at 21 C.F.R. § 1240.61, providing, in pertinent part:

No person shall cause to be delivered into interstate commerce or shall sell, otherwise distribute, or hold for sale or other distribution after shipment in interstate commerce any milk or milk product in final package form for direct human consumption unless the product has been pasteurized or is made from dairy ingredients (milk or milk products) that have all been pasteurized. . . .

The notice of the adoption of 21 C.F.R. § 1240.61 appeared in the Federal Register at 52 FR 29509 (August 10, 1987), and stated, among other things: "Raw milk, no matter how carefully produced, may be unsafe." "The theoretical health benefits of raw milk have never withstood scientific scrutiny."

The Court of Appeal of California issued what appears to be the only other reported case addressing the health concerns associated with raw milk: *Consumers Union v. Alta–Dena Certified Dairy*, 4 Cal.App.4th 963, 6 Cal.Rptr.2d 193 (1st App. Dist.1992). Sales of raw milk are legal within the state of California, and Alta–Dena Certified Dairy sells both pasteurized milk and certified raw milk. According to the California Court of Appeal, "Alta–Dena operates what is estimated by some to be the world's largest dairy." Approximately 15% of the dairy's production involves certified raw milk and raw milk products. The suit charged Alta–Dena with false and misleading advertising regarding its raw certified milk products, and the plaintiffs sought injunctive relief preventing Alta–Dena from falsely advertising the alleged benefits of its raw certified milk. The court noted, 4 Cal.App.4th at 966, 6 Cal. Rptr.2d 193:

Since the 1950's, Alta–Dena has promoted its raw certified milk and raw certified milk products (hereafter collectively referred to as RCM) as possessing various health and safety attributes. Printed brochures distributed by Alta–Dena touted its RCM as the "safest" and "purest" milk available; "ideal" for infants and a "basic food" for invalids.

The non-jury trial of the case continued for 54 days, during which 44 witnesses testified, and the court received approximately 40,000 pages of written evidence. Summarizing that evidence, the appellate court stated, 4 Cal.App.4th at 967, 6 Cal.Rptr.2d 193:

The evidence at trial overwhelmingly established that, contrary to the claims made in Alta–Dena's advertisements, RCM: (1) can contain highly dangerous organisms, (2) is less safe than pasteurized milk, (3) does not possess superior health and nutritional benefits, and (4) is not produced under the strictest health standards in the industry.

The appellate court recounted a portion of the evidence introduced at the trial, *id.* at 967–68, 6 Cal.Rptr.2d 193:

Alta–Dena's RCM has frequently been found to contain disease-causing organisms. From 1974 to the time of trial,

pathogens were found in Alta–Dena's RCM approximately 250 times by various public and private laboratories. The pathogen found most frequently was a particularly dangerous type of salmonella known as salmonella dublin (hereafter S. dublin). The United States Food and Drug Administration (hereafter FDA) has classified S. dublin as "life threatening." In California, approximately 80 percent of those who become ill with S. dublin are hospitalized and 20 percent die. Unlike less serious forms of salmonella which normally confine themselves to gastrointestinal illness, S. dublin frequently causes severe illness by invading the bloodstream and deep-body sites. Since S. dublin mainly infects cows and is killed by heating, it is primarily found in raw milk. Other harmful bacteria isolated from RCM include salmonella St. Paul, brucella (which can cause a serious disease known as brucellosis or undulant fever), listeria monocytogenes, and campylobacter.

The danger posed by the presence of these pathogens in RCM is very real. At trial, Consumers presented numerous examples of previously healthy persons who became ill after drinking Alta–Dena's products.

The court noted that the dangerous bacteria, such as salmonella dublin, can originate from within the cow, and as a consequence, cannot be avoided even if the dairy utilizes the most scrupulously clean milking process. The court stated, *id.* at 969, 6 Cal.Rptr.2d 193:

[E]xternal cleanliness[ ] cannot always eliminate harmful bacteria. Seemingly healthy looking cows known as "mammary shedders" can shed S. dublin from their mammary glands directly into their milk. As one expert stated, "you basically can't scrub the inside of the cow."

The court also summarized evidence that raw milk can be particularly dangerous to the 20 percent of the population with weakened immune systems, stating, *id.* at 968–69, 6 Cal. Rptr.2d 193:

While consuming RCM is hazardous for normally healthy individuals, RCM is especially dangerous to those who have

a reduced immunity as a result of illness or medical treatment. The elderly; pregnant women; those with cancer; those with AIDS and related HIV positive conditions; those taking cortisone, antibiotics, or antacids; diabetics and alcoholics are particularly at risk because very small amounts of disease-causing organisms can make these consumers ill. Combined, these groups represent some 20 percent of the population of California. The AIDS cases are especially poignant since these persons, not realizing the danger of RCM, seek out the product because it is promoted as a health food, only to fall ill from consuming it.

* * *

Infants too are at a special risk from pathogens contained in RCM because their immune systems are immature and their stomachs lack a needed type of acid.

Based upon its review of the evidence, the appellate court affirmed the order of the trial court that required Alta–Dena to include a label with a health warning on its products, and to include the following disclosure in all of its advertisements for a ten year period:

"WARNING: THE FOOD AND DRUG ADMINISTRATION (FDA) HAS DETERMINED (1) THAT THERE IS NO SATISFACTORY SCIENTIFIC PROOF THAT PASTEURIZATION SIGNIFICANTLY REDUCES THE NUTRITIONAL VALUE OF MILK AND (2) THAT THE RISKS ASSOCIATED WITH CONSUMING RAW CERTIFIED MILK OUTWEIGH ANY OF ITS ALLEGED HEALTH BENEFITS."

*Id.* at 971, 6 Cal.Rptr.2d 193.

Notwithstanding the evidence presented in the *Public Citizen* and *Alta–Dena* cases as set forth above, Maryland is one of only 22 states that (along with the District of Columbia) "essentially ban raw milk sales." Adams et al., *supra,* 13 DRAKE J. AGRIC. L. at 315. It seems that a majority of states permit some form of sale of raw milk to consumers. And although some of the states that prohibit sales of raw milk have also targeted animal leasing and sharing pro-

grams—*see, e.g.,* N.C. Gen.Stat. § 130A–279 (2009)—the state of Colorado adopted a statute in 2005 that expressly permits cow sharing, providing that the "acquisition of raw milk from cows or goats by a consumer for use or consumption by the consumer shall not constitute the sale of raw milk and shall not be prohibited if" the milk is obtained pursuant to a sharing arrangement. Colo.Rev.Stat. 25–5.5–117 (2008). A similar measure was introduced in the Maryland General Assembly in 2009 as House Bill 1080, but the measure failed.

The Maryland General Assembly has, however, in the past few years, adopted measures that permit cheese made from raw milk to be produced and sold in Maryland. *See* HG §§ 21–401(g), 410(b)(5), 416(d), and 417(c).

Despite the health risks pointed out above, demand for raw milk persists. An article published in U.S. News and World Report on March 20, 2009, observed: "A growing number of consumers are keen to drink raw milk, for reasons ranging from a desire to buy locally produced food to taste to a belief in its purported health benefits. Word of mouth abounds of how raw milk cleared up asthma and ear infections in children, improved osteoporosis in seniors, and even made autistic kids function better." Kerry Hannon, *Raw Milk Is Gaining Fans, but the Science Says It's Dangerous,* U.S. NEWS & WORLD REP., March 20, 2009. *See also* Note, *Raw Deal: Trade Implications of the U.S. Food and Drug Administration's Pending Review of Unpasteurized Cheeses,* 12 MINN. J. GLOBAL TRADE 461 (2003) ("Cheese lovers and food snobs the world over vow that the taste of pasteurized process cheeses simply cannot compare to that of cheeses made from raw (unpasteurized) milk.").

Oyarzo does not directly engage the Department in the debate as to whether the consumption of raw milk entails an unacceptable risk of ingesting milk-borne pathogens. In Oyarzo's view, the advisability of outlawing the consumption of raw milk is not the issue before the Court in this case. As Oyarzo puts it in his brief: "Although the Secretary's arguments in favor of outlawing the consumption of raw milk may

present debatable issues, that debate is for the legislature rather than this Court."

Although we have included information about the health risks of drinking raw milk above to help provide context for the Department's position in this case, we agree with Oyarzo that the question of whether to ban consumption of raw milk is a question left to the General Assembly. As of this date, the General Assembly has not made the possession of raw milk or the consumption of raw milk illegal in Maryland. But HG § 21–434 does make sales of raw milk to consumers illegal. Accordingly, the question for this Court is whether the Department had the power to adopt a regulation providing that the contractual arrangement proposed by Oyarzo constitutes a transaction that comes within the legislative prohibition of HG § 21–434, which specifically states: "a person may not sell raw milk for human consumption."

### D. The Proposed Contract

The Department insists that Oyarzo's agreement is a subterfuge, and that the transaction is a disguised sale of raw milk to consumers because the practical result of the arrangement is that consumers pay money to Oyarzo and end up receiving raw milk. Under the Bovine Sale and Agistment Agreement, the "purchaser" obtains a number of undivided interests in the herd of dairy cows for a set price per share, to be paid to Oyarzo. The purchaser also agrees to pay a set price per month to Oyarzo for the agistment services he provides. Section 4 of the agreement provides that the owner shall be entitled to receive a portion of the milk production of the herd—i.e., the raw milk—in a quantity that is directly proportionate to the ownership interest in the herd. But the agreement does not guarantee the production of any milk. The agreement also provides that the owner is entitled to receive a portion of the net proceeds obtained from the sale of any of the cows comprising the herd, equal to the owner's percentage interest in the herd. The agreement outlines the duties of the agister, Oyarzo, which include paying expenses

for maintaining the herd. The owner is responsible for the cost of any "special services" beyond the boarding expenses.

The agreement also requires the owner to obtain the consent of the agister before transferring or assigning any of the owner's rights or interests in the herd, but the consent may not be unreasonably withheld. The agreement contains a liability disclaimer under which the agister is not held liable to the owner for any loss or damage to the herd or for anything resulting from the boarding of the herd, and is not held liable for any sickness, death, loss or damage from the handling or consumption of raw milk produced by the herd. A termination provision in the agreement states that the agister, upon ninety days notice to the owner, may terminate the agistment portion of the agreement provided all other herd agreements are terminated simultaneously. Upon termination of the agreement the agister has the first option to purchase the owner's shares at the price the owner initially paid the agister for the shares.

The circuit court held:

3. [Oyarzo's proposed Bovine Sale and Agistment] Agreement does not specifically call for the sale of raw cow milk under the guise of calling for the sale of [an] interest in dairy cattle and agistment services. In fact, the agreement specifically indicates that it does not involve the sale of raw milk. However, the Agreement does involve the transfer of the production of the cows as the return for investment in the herd. That production is raw milk. As such, despite language to the contrary, the Agreement involves the transfer of raw milk for consideration. That is a sale.

4. Sections 21–401 through 21–436 of the Health–General Article of the Maryland Code (the "Act") do not prohibit the sale of dairy cows or undivided interests therein and do not prohibit the providing of agistment services (i.e., the care and feeding by a bailee, for a fee, of grazing animals owned by others). At issue here, however, is the herd production transfer. That product is the raw milk. That is

the provision [of the proposed agreement] which conflicts with the law.

5. The portion of the Amended Regulation (COMAR 10.15.06[.06]F(1)) that purports to clarify the meaning of the word "sale" as used in the Act, and as complained of here, is consistent with the Act, and does not exceed the authority of the Agency.

Nothing in the Bovine Sale and Agistment Agreement indicates that the arrangement is not intended for investors who wish to invest in a dairy farm but do not have the time or expertise to raise cows. But the sole return on the investment in Oyarzo's herd would be the receipt of raw milk, and the statutory scheme in HG §§ 21–401 through 21–436 would prevent any investor who receives raw milk under this contract from selling it directly to others for human consumption. The sale of raw milk is permitted only when it is sold *by* someone with a milk producer's permit *to* someone with a milk processor's permit. HG § 21–434. A "milk producer" is defined as "a person who operates a dairy farm," and a "milk processor" is "a person who owns, operates, or controls a milk plant." HG § 21–401(m)–(n). A milk plant is a "place where, for distribution, milk products are: (i) Processed; (ii) Pasteurized; (iii) Bottled or packaged; or (iv) Prepared," but does not include a retail store. HG § 21–401(*l*). An investor who owns a fractional interest in a herd but neither operates the farm nor owns a milk plant fits into none of these categories.

Indeed, Oyarzo's proposed agreement specifically prohibits the sale or resale of the raw milk produced by the herd, stating as follows:

Agister and Owner acknowledge that the sale of raw milk is prohibited by the State of Maryland. Under no circumstances shall either Agister or Owner transfer the ownership or possession of any raw milk production from the Herd in any transaction that would constitute a sale of milk in violation of the statutes of the State of Maryland.

It is theoretically possible that a person might lawfully invest in a herd of dairy cows, pay an agister to tend the cows,

and sell the milk to an approved milk processor, with the investor simply receiving monetary profits, if any. Oyarzo's proposed agreement, however, entitles the fractional owner to receive a proportionate share of the herd's total production of raw milk. And counsel for Oyarzo conceded at oral argument that the market value of a dairy cow decreases with the passage of time. As a result, it appears that the primary, and probably sole, motivation for a person to enter into one of these agreements with Oyarzo would be to acquire for personal consumption a portion of the raw milk produced by the herd.

Oyarzo argues that, even if a desire to drink raw milk is the subjective motivation for persons to purchase an ownership interest in a herd under such an arrangement, because it is not illegal in Maryland to purchase a fractional interest in a dairy cow or herd of dairy cattle, and owners of dairy cattle are the owners of any milk produced by their cows, the transaction he proposes simply does not constitute a "sale" of raw milk. Oyarzo points out that all milk produced by the cows is an incident of ownership of the cows, and is also property owned by the owner of the cows.

And historically, it has never been illegal in Maryland for an owner of the cows to enter into an agistment agreement with a person such as Oyarzo, who is willing to act as an agister. Under such an arrangement, the agister is a bailee for the owner of the cows. Therefore, even after the owner of the cows enters into the agistment agreement and the agister takes custody of the cows, the milk produced by the cows remains an incident of ownership that is a property right of the owner of the cows. Consequently, if the agister delivers raw milk to the owner of the cows, there is neither a sale of the milk by the agister nor a purchase of the milk by the cows' owner. The milk was already the property of the owner of the cows.

Oyarzo asserts that the Secretary of the Department does not have authority under the milk statute to outlaw via regulation the consumption of raw milk or to prevent the sale

by an agister of fractional ownership interests in a herd of dairy cows. He notes that the Court of Appeals has stated:

> Legislation may not be enacted by an administrative agency under the guise of its exercise of the power to make rules and regulations by issuing a rule or regulation which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, or impairs, limits, or restricts the act being administered.

*Mayor & City Council of Baltimore v. William E. Koons, Inc.*, 270 Md. 231, 237, 310 A.2d 813 (1973). *See also Medstar, supra,* 376 Md. at 20, 827 A.2d 83 ("agency regulations must be consistent with the letter and the spirit of the law under which the agency acts"); *Fields v. Dept. of Human Resources,* 176 Md.App. 152, 161, 932 A.2d 824 (2007) (although regulations that are consistent with the letter and spirit of the law under which they are promulgated will be upheld by the courts, the regulation must be, in fact, consistent with the letter and spirit of the statute to be enforced).

The Court of Appeals has also observed, however, that judicial review of a regulation adopted by a State agency is limited in scope to (a) whether quasi-legislative responsibilities have been properly granted to the agency, and (b) whether those responsibilities have been carried out in accordance with traditional standards of procedural and substantive fair play. *Fogle v. H & G Restaurant,* 337 Md. 441, 453–54, 654 A.2d 449 (1995). In *Medstar, supra,* 376 Md. at 20–21, 827 A.2d 83, the Court of Appeals stated: "Our scope of review in such actions is 'limited to assessing whether the agency was acting within its legal boundaries.'" (Quoting *Adventist v. Suburban,* 350 Md. 104, 124, 711 A.2d 158 (1998).)

In *Fogle,* Chief Judge Robert Murphy summarized the principles governing judicial review of agency regulations as follows, 337 Md. at 453–54, 654 A.2d 449 (footnotes omitted):

> State agencies often perform functions that are legislative in nature. *CBS v. Comptroller,* 319 Md. 687, 691–92, 575 A.2d 324 (1990). *See also Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 222, 334 A.2d 514 (1975).

Promulgation of new regulations by agencies is one of these so-called quasi-legislative activities. *Linchester, supra,* 274 Md. at 222, 334 A.2d 514. The regulation at issue in the instant case was adopted by way of the rule-making process. Agency regulations must be consistent with the letter and the spirit of the law under which the agency acts. *Christ v. Md. Department of Natural Resources,* 335 Md. 427, 437, 644 A.2d 34 (1994). *See also Maryland State Police v. Warwick,* 330 Md. 474, 481, 624 A.2d 1238 (1993); *Ins. Comm'r v. Bankers,* 326 Md. 617, 623, 606 A.2d 1072 (1992). Furthermore, while it is well-settled that there must be sufficient guidance given when legislative authority is delegated to agencies, we have held that "the modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of laws as the complexity of governmental and economic conditions increase." *Falik v. Prince George's Hosp.,* 322 Md. 409, 418, 588 A.2d 324 (1991) citing *Sullivan v. Bd. of License Comm'rs,* 293 Md. 113, 121, 442 A.2d 558 (1982). *See also Christ, supra,* 335 Md. at 442, 644 A.2d 34.

In assessing the validity of a new regulation, a court must simply determine whether "the [quasi-legislative] responsibilities were properly empowered to the agency and [whether they] have been performed within the confines of the traditional standards of procedural and substantive fair play." *Linchester, supra,* 274 Md. at 223, 334 A.2d 514. Keeping in mind concerns over maintaining sufficient separation of powers, we have held:

"This power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency. In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries."

*Weiner v. Ins. Admin.*, 337 Md. 181, 190, 652 A.2d 125 (1995) (quoting *Linchester, supra,* 274 Md. at 224, 334 A.2d 514); *Judy v. Schaefer,* 331 Md. 239, 265–66, 627 A.2d 1039 (1993) (recognizing that the scope of judicial review is more limited when the agency action is quasi-legislative, not quasi-judicial); *Storch v. Zoning Bd. of Howard Co.,* 267 Md. 476, 487, 298 A.2d 8 (1972).

The Court of Appeals also stated in *Fogle, id.* at 454–55, 654 A.2d 449:

> It is ... "not the function of the courts to pass upon the wisdom of the regulation, or to approve or disapprove it, if it does not exceed constitutional limits." *Givner v. Commissioner of Health,* 207 Md. 184, 192, 113 A.2d 899 (1955). *See also Weiner, supra,* 337 Md. at 185–87, 652 A.2d at 127; *Sugarloaf Citizens Assn. v. Northeast Md. Waste Disposal,* 323 Md. 641, 672–73, 594 A.2d 1115 (1991); *Crown Central Petroleum Corp. v. Mayor & City Council of Baltimore,* 258 Md. 82, 85, 265 A.2d 192 (1970). Finally, we have determined that courts should generally defer to agencies' decisions in promulgating new regulations because they presumably make rules based upon their expertise in a particular field. *Givner, supra,* 207 Md. at 192, 113 A.2d 899. This is especially true of agencies working in the area of health and safety, which rely extensively on their specialized knowledge of that area in promulgating regulations. *Id.* at 191, 113 A.2d 899.

There is a limit to judicial deference to an agency's rulemaking authority. The Court of Appeals noted in *Medstar, supra,* 376 Md. at 22, 827 A.2d 83, that the agency's regulations must be consistent with the statutory scheme:

> While reliance upon the broad statutory authority conferred by the Legislature generally will be sufficient to justify an agency's regulation/rule making authority, logic compels the self evident conclusion that there is an outer limit to an agency's authority. This Court's attempt to demarcate the outer limits of an administrative agency's authority has focused on whether the regulations and rules promulgated

by the agency are consistent with the statutory scheme under which the agency operates.

The milk statute currently states in HG § 21–406 that "[t]he Secretary [of the Department] shall adopt rules and regulations to carry out the provisions of this subtitle." When the subtitle was first enacted as 1971 Laws of Maryland, Chapter 573, the delegation of quasi-legislative power to the Secretary was described in more detail as follows:

> The Secretary shall from time to time make, revise, or revoke rules and regulations pertaining to the definitions, standards of identity, production, collection, transporting, receiving, transferring, processing, pasteurization, packaging, storing, and selling of milk products. All rules and regulations issued by the Secretary, when duly promulgated, shall have the force and effect of law.

██ The current, more condensed version of the delegation of authority was adopted in 1982 as part of a comprehensive code revision. *See* 1982 Laws of Maryland, Chapter 240. A Revisor's Note to the statutory distillation of this section stated that no substantive change was intended. Indeed, there is no substantive conflict between the two versions. As the Court of Appeals observed in *Allen v. State,* 402 Md. 59, 71–72, 935 A.2d 421 (2007):

> When a substantial part of an Article is revised, "a change in the phraseology of a statute as part of a recodification will ordinarily not be deemed to modify the law unless the change is such that the intention of the Legislature to modify the law is unmistakable." *Comptroller of the Treasury v. Blanton,* 390 Md. 528, 538, 890 A.2d 279, 285 (2006) (quoting *Rettig v. State,* 334 Md. 419, 427, 639 A.2d 670, 674 (1994)); *see also Pye v. State,* 397 Md. 626, 634, 919 A.2d 632, 637 (2007). Furthermore, "[r]ecodification of statutes is presumed to be for the purpose of clarity rather than change of meaning and, thus, even a change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so radical and material that the intention of the Legislature to modify the law appears

unmistakably from the language of the Code." *Blanton,* 390 Md. at 538, 890 A.2d at 285 (quoting *Md. Div. of Labor and Indus. v. Triangle Gen. Contractors, Inc.,* 366 Md. 407, 422, 784 A.2d 534, 543 (2001)); . . . .

*Cf. Stanley v. State,* 390 Md. 175, 186, 887 A.2d 1078 (2005) (revisor's note indicating that the change was made without substantive change does not override the fact the amendment "radically changes" the effect of the statute).

Here, there is no indication that the legislature intended to restrict the regulatory power of the Department when the milk statute was recodified in 1982. Accordingly, we construe the delegation of quasi-legislative authority in HG § 21–406 to be as broad as the delegation in the 1971 version of the milk statute.

■ It is arguably easier to discern from the earlier version, however, that the regulatory powers granted to the Secretary of the Department with respect to milk are very broad, and certainly broad enough to encompass the transaction proposed by Oyarzo. As the Court of Appeals observed in *Medstar, supra,* 376 Md. at 21, 827 A.2d 83:

[W]here "the General Assembly has delegated ... broad power to an administrative agency to adopt [legislative rules] or regulations [in a particular area], this Court has upheld the agency's rule or regulations as long as they did not contradict the language or purpose of the statute." *Christ v. Department of Nat. Res., supra,* 335 Md. at 437, 644 A.2d at 39; *Lussier v. Maryland Racing Commission,* 343 Md. 681, 689, 684 A.2d 804, 807–808 (1996).

■ It is not up to us to determine whether the Department crafted the most artful regulation governing the handling of raw milk when it adopted COMAR 10.15.06.06F; we defer to the agency and its expertise in the milk distribution process. Even if the transaction proposed by Oyarzo does not fit within the traditional framework of a sale of milk by one party to another, when the entire package is considered—including the fact that the specific agister's services are a mandatory component of the purchase of the interest in the

herd, the fact that the arrangement requires the recipients of the raw milk to continue paying ongoing fees to the dairy farmer for as long as the ownership interest in the herd continues, and the fact that the most apparent benefit, if not the only benefit, the contracting parties receive for monies paid to Oyarzo would be the right to receive raw milk—the scheme has sufficient characteristics of a sale of milk to be an arrangement the Department may regulate and prohibit. The arrangement is properly subject to the Secretary's responsibility to make rules and regulations pertaining to the definition, production, collection, transportation, receipt, transfer, pasteurization, storage and sale of milk products within the State of Maryland. The Department's adoption of COMAR 10.15.06.06(F)(1) was, in the words of *Medstar, supra,* 376 Md. at 22, 827 A.2d 83, "consistent with the statutory scheme under which the agency operates." Accordingly, we decline to declare the regulation invalid.

Although the Department has not directed us to any reported opinion that supports its position that the arrangement proposed by Oyarzo should be considered the sale of raw milk, we have reviewed one Virginia case that held a goat-sharing arrangement to involve the sale of goats' milk. In *Kenley v. Solem,* 237 Va. 202, 375 S.E.2d 532 (1989), the Supreme Court of Virginia reviewed an agreement under which, "[f]or $50, an individual who wished to receive unpasteurized goats' milk could purchase a 24 percent interest in a goat, which, upon payment of a $3 daily 'maintenance' fee, entitled the purchaser to a gallon of milk each day." *Id.* at 203, 375 S.E.2d 532. No more than two such interests in each goat were sold, and the goat farmer, Christine Solem, would retain a 52 percent interest in each goat. *Id.* Solem was required to ensure that each owner received a daily gallon of milk, even if the co-owned goat was not producing that much, in which event Solem was required to provide milk from her "share." *Id.* The court noted that the "owner of the 24 percent interest in a goat does not receive only his goat's milk—it goes into a common container, and he gets milk from all of the goats producing milk. In some instances he may not receive any of

his goat's milk." *Id.* at 204, 375 S.E.2d 532. Under such circumstances, the court held that Solem's "distribution of the milk is essentially a sale of milk." 237 Va. at 204, 375 S.E.2d 532. (The court had previously come to a similar conclusion with respect to an earlier scheme Christine Solem had developed in which consumers leased the milking privileges for a goat for a 24 hour period. *Carbaugh v. Solem,* 225 Va. 310, 302 S.E.2d 33 (1983)).

Although there are clear factual distinctions between the sharing arrangement in *Kenley* and the transaction contemplated in the present case, the Oyarzo agreement does involve the distribution of raw milk and the receipt of raw milk by consumers. Accordingly, we conclude that the Department acted within the scope of its authority when it adopted a regulation to preclude such a distribution plan. We therefore affirm the circuit court's judgment as to Count one of the complaint.

■ The circuit court did not address the claim asserted in Count two, but simply dismissed that count as moot. We disagree that the claim was moot. Accordingly, we vacate that portion of the circuit court's judgment and remand the case for further proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY IS AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEES.**