42 A.3d 63

Edwin H. LEWIS

v.

Douglas F. GANSLER, et al.

No. 2174, Sept. Term, 2009.

Court of Special Appeals of Maryland.

April 25, 2012.

Matthew T. Mills & Raymond S. Smethurst, Jr. (Adkins, Potts & Smethurst, LLP, on the brief) Salisbury, MD, for appellant.

Adam D. Snyder (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., KEHOE, ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

KEHOE, J.

The primary issue in this appeal is whether the Critical Area Commission for the Chesapeake and Atlantic Coastal Bays (the "Commission") acted in a quasi-legislative or in a quasi-judicial capacity when it decided that certain provisions of Wicomico County's Critical Area program did not conform to state law. We conclude that the Commission was acting quasi-legislatively and that it did not exceed its statutory authority in so doing. Thus, we will affirm a decision of the Circuit Court for Wicomico County granting summary judgment to the Attorney General and the Commission in an action against Edwin H. Lewis to enforce provisions of Wicomico

County's Critical Area program. On appeal, Mr. Lewis presents two questions which we have reworded:

I.   Was the Commission acting within the scope of its authority when, pursuant to Natural Resources Article § 8–1809(*l* ), it determined that Wicomico County's Critical Area program contained a clear mistake, omission, or conflict with the Critical Area Act or criteria?

II.  Did the Commission illegally interfere with Mr. Lewis's efforts to obtain a demolition permit and other related permits from Wicomico County?

## BACKGROUND

This is the third time that aspects of the long-running dispute between Appellant and State and local regulatory agencies have been addressed by an appellate court of this State. *See Lewis v. Dep't of Natural Res.,* 377 Md. 382, 395, 833 A.2d 563 (2003) (*"Lewis I "*); *Lewis v. Dep't of Natural Res.,* No. 608, September Term 2005 (filed January 22, 2007), *cert. denied* 399 Md. 34, 922 A.2d 574 (2007) (*"Lewis II "*). We set out the statutory scheme as explained by Judge James Eyler in *Lewis II,* with some additions.

In 1984, the General Assembly enacted the Maryland Critical Area Act (the "Act"), codified as MD.CODE. ANN., NAT. RES. § 8–1801 *et seq.* (1973, 2007 Repl.Vol., 2011 Supp.) ("NR"), to establish and implement a resource protection program to protect the water quality and natural habitats of the Chesapeake Bay and its tributaries. NR § 8–1801(b)(1).[1] A cooperative endeavor, the Act authorized local governments exercising planning and zoning powers within the Critical Area[2] to

---

1.  In 2002, the Act's coverage was broadened to include Maryland's Atlantic Coastal Bays. *See* Ch. 433 of the Acts of 2002.

2.  Generally speaking, the Chesapeake Bay Critical Area consists of "[a]ll waters of and lands under the Chesapeake Bay and its tributaries to the head of tide" and all land and water areas "within 1,000 feet beyond the landward boundaries of State or private wetlands and the heads of tides...." NR § 8–1807(a). The Atlantic Coastal Bay Critical Area is similarly defined. NR § 8–1807(b).

establish resource protection programs in a "consistent and uniform manner subject to State criteria and oversight." NR § 8–1801(b)(2). The "criteria" referred to in § 8–1801(b)(2) are set out in COMAR 27.01.10.01 *et seq.* Among these is that each local jurisdiction "shall demonstrate that the local regulations and programs proposed to meet the criteria in this regulation are enforceable." COMAR 27.01.10.01.H.

A local government's program typically consists of provisions in the jurisdiction's zoning and subdivision regulations, comprehensive plans and similar land use controls pertaining to the Critical Area. *See* NR § 8–1808(c). These provisions are to implement the Act's three primary goals: minimizing adverse impacts on water quality from pollutants; conserving fish, wildlife and plant habitat; and establishing land use policies to accomplish the first two while accommodating growth within the Critical Area and, at the same time, addressing "the fact that, even if pollution is controlled, the number, movement, and activities of persons in the [Critical] area can create adverse environmental impacts." *See* NR § 8–1808(b).

One of the most important aspects of any Critical Area program is the "buffer," defined as "an existing, naturally vegetated area, or an area established in vegetation and managed to protect aquatic, wetlands, shoreline, and terrestrial environments from manmade disturbances." NR § 8–1802(a)(4). Restrictions upon development activities within buffer areas are integral components of each local Critical Area program. *See, e.g.,* COMAR 27.01.09.01.C (setting out mandatory policies regarding buffer protection for each local program); *Critical Area Comm'n v. Moreland,* 418 Md. 111, 116 n. 9, 12 A.3d 1223 (2011) (noting the "significant environmental benefits of requiring a permanently protected buffer between upland land uses and tidal waters, tidal wetlands, and tributary streams . . . .").

Local governments have the primary responsibility for the development and implementation of their respective programs, subject to the review and approval of the Commission. NR

§ 8–1808(a). To ensure that local programs comply with statutory and regulatory requirements and are enforceable, the Commission has been granted "all powers necessary for carrying out the purposes of this subtitle, including . . .;" the power to adopt and amend regulations for the administration and enforcement of the State and local programs. NR § 8–1806(a)(1).

In addition to its other oversight and review powers, if the Commission concludes that a local government's program "contains a clear mistake, omission or conflict with the criteria or law, the Commission may: (i) notify the local jurisdiction of the specific deficiency; and (ii) request that the jurisdiction submit a proposed program amendment or program refinement to correct the deficiency." NR § 8–1809(*l*)(1). The local jurisdiction must submit any necessary amendments to the Commission within 90 days of being notified of the deficiency. NR § 8–1809(*l*)(2). Any projects approved by the local jurisdiction "under a part of a program that the Commission had determined to be deficient shall be null and void after notice of the deficiency." NR § 8–1809(*l*)(3).

In addition to local enforcement efforts, the Chair of the Commission may refer a possible violation of a local Critical Area program to the Attorney General for enforcement proceedings. NR § 8–1815. This statute authorizes the Attorney General in such an action to "invoke any sanction or remedy available to local authorities," § 18–515(c), as well as to bring an action in equity to, among other things, "compel restoration of lands or structures to their condition prior to any modification which was done in violation of approved project plans." NR § 8–515(d).

Wicomico County's Critical Area program, approved by the Critical Area Commission on September 6, 1989, is codified in Chapter 125 of the County Code. *See* Wicomico, Maryland County Code § 125–1(C).

Pertinent to the issues before us, Chapter 125 prohibits "new development activities, including clearing of existing natural vegetation, erection of structures, construction of new

roads, parking areas or other impervious surfaces and the placement of sewage disposal systems" within the buffer. County Code § 125–9. Additionally, the County Code authorizes the County's Board of Appeals to grant variances from the strict application of the County's Critical Area regulations, including its buffer regulations. *See* County Code §§ 125–35 to 125–38.[3] The County Code contains enforcement provisions. Specifically, the County Zoning Administrator is authorized to enforce the County Code by notifying offending property owners of the violation, "indicating the nature of the violation and ordering the action necessary to correct it[,]" including

---

3.  Specifically, the County Code provides:
    **§ 125–35. Authorization.**
    The Wicomico County Board of Appeals is hereby empowered to grant variances to the provisions of this chapter where, owing to special features of a site or other circumstances, a literal enforcement of provisions would result in unwarranted hardship.
    **§ 125–36. Bases for grants.**
    The Board of Appeals shall examine all facts of the case and render a decision. Variance requests in the Critical Area District shall not be granted unless the decision is based on the following criteria:
    A. That special conditions or circumstances exist that are unique to the subject property or structure and that a strict enforcement of the provisions of this chapter would result in unwarranted hardship which is not generally shared by owners of property in the same land use management areas ... of the Critical Area District.
    B. That strict enforcement of the provisions within the Critical Area District would deprive the property owner of rights commonly shared by other owners of property in the same management area within the Critical Area District.
    C. That the granting of a variance will not confer upon an applicant any special privilege that would be denied to other owners of like property and/or structures within the Critical Area District.
    D. That the variance request is not based upon conditions or circumstances which are self-created or self-imposed, nor does the request arise from conditions or circumstances either permitted or nonconforming which are related to adjacent parcels.
    E. That the granting of a variance will not adversely affect water quality or adversely impact fish, wildlife or plant habitat within the Critical Area District, and that the granting of the variance will be consistent with the spirit and intent of the critical area program and associated chapters.
    F. That greater profitability or lack of knowledge of the restrictions shall not be considered as sufficient cause for a variance.
    G. That the proposed variance is consistent with the Wicomico County Comprehensive Plan and Chapter 225, Zoning.

ordering the removal of illegal structures, and taking "any other action authorized by this chapter to ensure compliance with or to prevent violation of its provisions." County Code § 125–11(B)(1)(b).

Having set forth the statutory scheme in very broad strokes, we now turn to the facts in the case before us.

### FACTUAL AND PROCEDURAL BACKGROUND[4]

In April 1999, Appellant purchased a tract of land in Wicomico County on a tributary of the Nanticoke River consisting of 69.57 acres of tidal marsh surrounding three upland areas aggregating 7.23 acres. The largest of the upland areas, named "Phillips Island," totals 5.30 acres and is the subject of the current litigation. "Because of the island's irregular shape, nearly the entire island . . . lies within the Critical Area Buffer, as defined by the county Code." *Lewis I,* 377 Md. at 395, 833 A.2d 563.

In the Summer or Fall of 1999, Appellant hired a contractor to construct six buildings on the island. *Id.,* 377 Md. at 395– 396, 833 A.2d 563. At least part of each building was located in the buffer. *Id.* Neither Appellant nor his contractor obtained permits or sought County approval prior to initiating construction. *Id.* at 395, 833 A.2d 563. When this was called to his attention, Appellant "ceased construction of the camp and began to confer with County officials in an attempt to obtain the necessary permits." *Id.* at 395 n. 9, 833 A.2d 563.

---

4. The cast of characters in this case is extensive and includes the following individuals: R.S. Smethurst, Jr., Esq., ("Appellant's Counsel"); Marianne E. Dise, Esq., Assistant Attorney General and Principal Counsel to the Commission ("Commission Counsel"); Edgar A. Baker, Jr., Esq., County Attorney for Wicomico County ("County Attorney"); Margaret G. McHale, Chair of the Commission ("Commission Chair"); Ren Serey, Executive Director of the Commission ("Executive Director"); Richard M. Pollitt, Wicomico County Executive ("County Executive"); and John F. Lenox, Director of the City of Salisbury–Wicomico County Department of Planning, Zoning and Community Development ("County Planner"). We will refer to these persons by their indicated titles.

Thereafter, Appellant submitted an application to the Wicomico County Board of Appeals for an after-the-fact variance from the restriction on building in the Critical Area Buffer. The Board denied the application in a written decision dated February 13, 2001. *Lewis I*, 377 Md. at 397, 833 A.2d 563. The Board's decision was affirmed by both the Circuit Court for Wicomico County and this Court, but was vacated and remanded to the Board by the Court of Appeals for failure to consider "all of the Wicomico County Code variance criteria and misapplying the unwarranted hardship standard." *Lewis I*, 377 Md. at 390, 437, 833 A.2d 563.[5]

On remand, the Board held additional argument but did not receive new evidence. *Lewis II*, slip op. 2. Issuing new findings and conclusions to address the mandate of *Lewis I*, the Board again denied Appellant's variance application on June 24, 2004. *Lewis II*, slip op. 2. The circuit court upheld the Board's decision and this Court affirmed on January 22, 2007. *Lewis II*, slip op. 2, 24. The Court of Appeals denied Appellant's petition for a writ of certiorari on May 11, 2007. *Lewis v. DNR*, 399 Md. 34, 922 A.2d 574 (2007).

### The Current Controversy

We have now reached the dispute that led to the current litigation. When certiorari was denied in *Lewis II*, the six buildings on Philips Island were in various states of completion; shortly thereafter, Appellant's Counsel informed the representatives of the County planning staff of Appellant's intention to remove these structures and to replace them with

---

5. In response to the Court's holding in *Lewis I*, the General Assembly amended NR § 8–1808(d)(1) to provide that, for purposes of Critical Area variance applications, " 'unwarranted hardship' means that, without a variance, an applicant would be denied reasonable and significant use of the entire parcel ... for which the variance is requested." Ch. 526, 2004 Laws of Maryland. The preamble to Chapter 526 stated:

In its recent decision of *Lewis v. Department of Natural Resources*, the Court of Appeals suggested that a prohibition on new development in the buffer, even when viable alternatives exist elsewhere on the parcel, may constitute a taking of property without just compensation, and the General Assembly profoundly disagrees with this suggestion. . . .

a single-family house. In a letter dated August 23, 2007, the County Planner ordered removal of the six structures:

> all administrative requests and appeals to retain the structures as constructed on Phillips Island have been denied . . . corrective action must now occur . . . [and] all structures constructed on Phillips Island in violation of the Wicomico County Critical Area law must now be removed.

The County Planner further stated that the lawful removal of the violating buildings, which should begin as soon as possible, would require a buffer management plan,[6] a demolition permit, and additional coordination or approval from other local, state or federal agencies.[7]

On September 5, 2007, Appellant's Counsel responded by letter asserting that, Appellant "was prepared to make the necessary arrangement to have the hunting camp structure removed, but intends to place a single-family house on the site—something he clearly has the right to do." To that end, Appellant intended to file an application for a variance to convert the largest structure on the island, a 40′ by 40′ building, into a residence.[8]

---

**6.** A buffer management plan is "a narrative, graphic description, or plan of the buffer that is necessary when an applicant proposes a development activity that will: (i) Affect a portion of the buffer; (ii) Alter buffer vegetation; or (iii) Require the establishment of a portion of the buffer in vegetation." COMAR 27.01.09.01(3).

**7.** In order to remove the buildings in compliance with local law, Appellant needed County approval of an application for a demolition permit as well as a buffer management plan. In support of his request for a demolition permit, he submitted a structure removal plan, which called for the removal of the structures from their foundations and their transportation from Phillips Island by barge. Appellant's buffer management plan described the means by which damage to the buffer would be minimized during the demolition process and the affected areas of the buffer restored after demolition was complete. The two permits were inextricably linked as a change in the structure removal plan could require changes in the buffer management plan.

**8.** The parties subsequently referred to the 40′ by 40′ structure as "Building No. 1," as shall we.

At this point, the staff of the Commission became involved. On September 26, 2007, the Commission's Counsel wrote a letter to the County Planner informing him that "the position of this Office is that no new permit or variance application may be accepted for processing until all of the illegal structures are removed and the site is restored . . . in accordance with an approved [buffer management plan]." The County Planner then wrote to Appellant on October 12, 2007, stating that, although the Department was aware of his interest in building a single-family home on the property, the County would not accept or process any new variance application until the existing structures on Phillips Island were removed and the site restored in accordance with an approved buffer restoration plan.

There followed exchanges of correspondence between the County Planner and Appellant's Counsel. In substance, the County pressed Appellant to prepare and submit a structure removal plan and a buffer management plan as quickly as possible. These plans, together with supporting documentation, were eventually submitted in full on April 4, 2008.

In his structure removal plan, Appellant proposed dividing the demolition process into two phases. Phase One would consist of removing five of the six structures on the Island. Appellant proposed beginning work on Phase One within ten days after receiving a demolition permit. Phase Two would consist of the demolition of Building No. 1 "in the event that a Buffer variance for it . . . is not granted. . . ." In contrast to Phase One, Phase Two would commence only "[i]n the event that the requested variance" is not granted. Three days later, Appellant's Counsel filed a new variance application to convert Building No. 1 into a part-time residence. Appellant's Counsel acknowledged that the approval of this variance would be conditioned "upon the satisfactory removal of the other buildings from the buffer if that has not been accomplished by the hearing date."

Appellant's proposal created a dilemma for the County. By their very existence, the buildings interfered with the proper

functioning of the buffer. The County Planner had already ordered the prompt removal of all of the structures and the restoration of the damaged buffer areas. Appellant's position, in effect, was that he would remove Building No. 1 only if and when he was unsuccessful in his new variance application. There was thus an irreconcilable conflict between what the County wanted: prompt removal of all of the buildings and prompt remediation of the buffer, and what Appellant was willing to do: prompt removal of some of the buildings with buffer remediation followed by a possible later removal of Building No. 1, a process that would cause additional damage to the buffer, and would then be followed by additional remediation. Breaking the process into two stages, as Appellant proposed, would in large part duplicate the damage to the buffer caused by the demolition process. The County's alternative would be to defer all enforcement actions until the second variance application was finally decided, which would have permitted a violation of the law to continue indefinitely. Moreover, the County Attorney had concerns as to whether, under the County Code, the Board of Appeals could decline to process Appellant's variance application until the structures on the property were removed and the required environmental remediation completed.

The staffs of the Commission and the County communicated about the issue. This dialogue seems to have been conducted largely by the Commission Counsel and the County Attorney. The record does not contain a first-hand account from either of them. In her deposition, the Commission Chair testified that, after "many conversations" between the two staffs, it became clear that the County officials "didn't believe they had the authority to deny the processing of the variance application" and that "there wouldn't be any meeting of the minds on that issue." She continued:

> So ... we discussed the various options that we had at that point, given our concern about [Appellant] and his cabins and the preservation of the resource, our desire to implement State policy in the Critical Area program, as we understand it, and as we've tried to implement it and

enforce it for 20 some years, as long as the Commission has been around.

We felt that the best, most effective, and really only choice we had would be to impose a sanction as soon as possible on the Wicomico County program to be very, very clear that not only under local authority, but under the state authority of the Commission and our authority under the Natural Resources Article, that it was not appropriate to process the application.

And, in fact, according to the terms of the sanction that was imposed . . . any processing of a variance will be null and void. . . .

The Commission Chair brought the matter before the Commission at its May 7, 2008, meeting. The relevant portion of the meeting minutes state:

[The Commission Chair] said that she will now discuss the Wicomico County Program Implementation issues. She said there are some issues that have arisen in [Appellant's] Case. It has been going on for eight years. [The Commission Counsel] has been representing our rights. Last year, a year this Friday, the Court of Appeals denied the case. Almost a year later, the cabins are still standing there. What has happened as a result of [Appellant's] Case is that it has brought to light some concerns the Commission has regarding the Wicomico County Program itself and how it is handling [Appellant's] cabins. The Chair said she has asked [the Executive Director] to prepare a summary of the background, what we are doing with this, and how it stands today.

[The Executive Director] reviewed the eight-year history of the project. He said now, based on the Wicomico County Ordinance provision that allows an applicant with a variance to reapply for another variance after one year, [Appellant] has reapplied for another variance. He said that after many more discussions, the County has informed us that officially they must process the variance even though there is an existing County order to remove the cabins. The

County has notified the Commission that they will process the variance. [The Executive Director] said that staff has recommended to the Chair that the issue before the County is not a variance issue, it is an enforcement issue and instead of rejecting the application for the new variance the county is preparing to hear it. That is not consistent with the Critical Area law or the Wicomico County Code. Staff has recommended to the Chair that the Commission consider an action to officially notify the County that their program is deficient, that it contains a mistake, omission or conflict, and that the Commission exercise its authority under the law to require corrections to Wicomico County's Critical Area Program regarding variances. [Commission Counsel] said that under the County's Program, a disappointed applicant has to wait one year before reapplying for a variance for which he was turned down. The one-year time limit from when the states's highest court turned down [Appellant's] most recent appeal ends on May 11. She said the final court order was that the cabins must come out. [Commission Counsel] said the County cannot process an application for the very same structure that is still there. [Commission Counsel] said [Appellant] submitted his application for variance in April. The County has not yet processed it because of the one-year deadline.

The Commission then unanimously approved the following motion:

That the Critical Area Commission votes to invoke the provision of Annotated Code of Maryland Natural Resources Article 8–1809(*l*) to determine that the Wicomico County Critical Area Program contains a clear mistake, omission, or conflict with the Commission's law or criteria. The Commission determines that the County's Critical Area Program lacks provisions to ensure effective implementation and enforcement of the County's Critical Area law with regard to variances. The County's Critical Area Program lacks provisions to ensure effective implementation and enforcement of the County's Critical Area law with regard to variances. The County's variance provisions, Article VI,

§§ 125–36 through 125–38, are deficient in that these provisions contain no standards under which the County may not accept an application for variance, even if the requested project has been adjudicated as a violation of the County's Critical Area law.

The Commission shall notify the County of this omission, and within 90 days the County shall submit program amendments or refinements to correct the deficiency, Any future local approvals of variances shall be null and void until this deficiency is corrected. Until this deficiency is corrected, the County shall not accept, nor process, any applications for variances to the Critical Area Program.

That same day, the Commission Chair wrote to the County Executive, informing him of the Commission's action and explaining the Commission's reasoning. In addition, the Chair directed the County "not [to] accept or process any variance application pursuant to [the Critical Area provisions] of the County Code."

The County Executive responded on May 28, 2008. He stated that, "[a]s County Executive for Wicomico County, please be assured that we share the Commission's concern for the potential of 'endless recycling of variance applications.' " The County Executive explained that "[w]e welcome the opportunity to revise this provision of our Critical Area Program so that the Commission will be able to utilize it as a best practices model throughout the Chesapeake and Atlantic Coastal Bays." The County Executive further agreed not to accept or process any variance applications. Echoing the Commission Chair's concerns regarding Appellant's case, the County Executive requested that the Commission join Wicomico County in requesting that the "enforcement of [the County's August 23, 2007 removal order] be assumed by the Office of the Attorney General."

On May 14, 2008, Appellant's Counsel wrote to the County Planner inquiring into the status of the building removal and buffer management plans and asserting that he had a contractor on standby ready to execute the proposed work. On June

2, 2008, the County Planner responded to Appellant's Counsel in a letter explaining that the County could not accept or process any variance application and that, therefore, they would not initiate review of Appellant's application.

On June 26, 2008, Appellant's Counsel filed an appeal of the County Planner's decision "refusing to initiate and/or process [Appellant's] buffer variance application that was filed on April 7, 2008." The Board of Zoning Appeals subsequently affirmed the Department's decision to deny Appellant a hearing on his variance application. Appellant filed a petition for judicial review of the Board's decision.

While Appellant's administrative appeal was pending, the Attorney General filed this action in the circuit court. The Attorney General sought "a court order directing appellant to (1) remove the unlawfully built structures, (2) restore the property in the Buffer to its original condition before he built there, (3) plant native vegetation in mitigation of the development activity, and (4) pay damages." On that same day, an Assistant Attorney General wrote to the Chair of the County Board of Appeals, requesting that, because of the pending litigation, the Board "refrain from taking any action pertaining to [Appellant's] property in Wicomico County" without first consulting with the Office of the Attorney General.

In his answer, Appellant alleged that he had made every effort to comply with orders to remove unlawful structures and had prepared and submitted a detailed buffer management plan but the Commission had thwarted his efforts to comply with the County's removal order by refusing to review his submission. Appellant also filed a third party-complaint against the Commission for a declaratory judgment and against Wicomico County for a writ of mandamus. In setting forth his claim against the Commission, Appellant asserted that the Commission, with no factual or legal justification, interfered with his right to a hearing on his variance application, his efforts to obtain a variance, and his efforts to bring his property into compliance with the Critical Area law. Appellant contended that, but for the Commission's unwarranted

interference, all of the offending structures would have been removed before the commencement of this law suit.

As to his claim against the County, Appellant alleged that, because the Commission's actions were arbitrary and without factual or legal justification, they did not deprive the County or its Board from accepting, processing or granting legally binding and legally effective buffer variances. Appellant requested that the court issue a writ of mandamus ordering the County to hold a hearing on his variance application.

Both third-party defendants moved to dismiss the third-party complaint but with different results. The circuit court granted the County's motion on the ground that mandamus was inappropriate because Appellant had an existing remedy, namely, his pending petition for judicial review.[9] For its part, the Commission asserted that Appellant lacked standing to contest the Commission's decision to suspend the County's variance program and moved to dismiss the third-party claim for that reason. The circuit court denied the motion.

After conducting discovery, Appellant filed a motion for summary judgment, arguing that the Commission had no factual or legal basis for its actions to deny the Board of Appeals the authority to consider Appellant's buffer variance and, therefore, the Commission's actions had no legal force or effect.

The Attorney General and the Commission filed a cross-motion for summary judgment and an opposition to Appellant's motion for summary judgment. The motion stated that Appellant has been in violation of the State and County Critical Area law for a decade, Appellant's applications for variances have been twice denied and the appeals of those denials have been exhausted, and that the County has ordered Appellant to remove the structures, but the structures still remained. They contended that the Commission's determination that the County program was deficient was proper and did not hinder Appellant's ability to remove the offending

---

9. Appellant does not challenge this decision in this appeal.

structures, so Appellant could not use the Commission's determination as a defense to his ongoing violation of the law. The Attorney General and the Commission concluded by requesting that the court enter a judgment declaring Appellant in violation of the law and issue an injunction requiring Appellant to comply with the State and County law by removing the structures that he unlawfully erected in the Critical Area Buffer and restoring the property to its pre-violation state.

After a hearing, the court filed an opinion and order in which it denied Appellant's motion, granted the Attorney General's and the Commission's motion, and ordered that Appellant "remove the unlawfully built structures, restore the property in the buffer area to the original condition, mitigate buffer area disturbance by the planting of native vegetation, and pay damages pursuant to NR § 8–1815.1(G)(3)." Pertinent to the issue raised in this appeal, the court concluded that the Commission "properly found the Wicomico County Critical Area Program to be deficient pursuant to NR § 8–1809(1);" that the Commission "properly advised Wicomico County not to accept or process [Appellant's] 2008 variance application;" and that the Commission's decision "does not prevent [Appellant's] from removing the offending structures."

Appellant filed an appeal from the court's judgment.[10]

### ANALYSIS

Appellate courts review the grant of a motion for summary judgment *de novo.* *Murray v. TransCare Maryland,* 203 Md.App. 172, 198–99, 37 A.3d 987 (2012). Our role is two-fold: "we determine first, whether there is a genuine dispute of material fact, and second, whether the party is entitled to judgment as a matter of law." *Id.* In the case before us, neither party contends that there are material disputes of fact, and we agree. Thus our role is to decide whether the circuit court was legally correct after our own review of the record. *Gonsalves v. Bingel,* 194 Md.App. 695, 708, 5 A.3d 768 (2010)

---

**10.** The circuit court has stayed the Attorney General's enforcement action pending the outcome of this appeal.

(citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 478–79, 914 A.2d 735 (2007)).

## I. NR § 8–1809(*l*): "Clear Mistake, Omission, or Conflict"

Appellant contends that the Commission's determination that the County's program contained "a clear mistake, omission or conflict with the Commission's law or criteria [because] the County's Program lacks provisions to ensure effective implementation and enforcement of the County's Critical Area law with regard to variances" was invalid for three reasons. First, he argues that the Commission's action in suspending the buffer variance provisions of the County's program was administrative (that is, quasi-judicial),[11] rather than quasi-legislative, because it was purportedly taken to facilitate the enforcement of existing Critical Area law and criteria as to a single property. Second, Appellant contends that, regardless whether the Commission's action is considered as quasi-legislative or quasi-judicial, "the Commission's actions were so arbitrary and capricious as to be beyond its legal boundaries, because they were not based on correct or relevant facts or law," and were thus invalid. Finally, he asserts that the Commission's actions deprived him of procedural due process because it prevented the County's Board of Appeals from considering a variance application that he had a right to file.

We do not find these arguments to be persuasive. While the appellate courts of this State have not yet considered the issue—at least in a reported opinion—we conclude that the

---

11. Appellant employs the term "administrative capacity" in his brief. Earlier Maryland cases used the terms "administrative" and "quasi-judicial" interchangeably, *See, e.g., Prince George's County v. Silverman*, 58 Md.App. 41, 50–51, 472 A.2d 104 (1984) ("[T]he [Prince George's County] council was not functioning in a purely legislative capacity. Rather it operated in a quasi-judicial or administrative capacity.") We will use the term "quasi-judicial" to be consistent with contemporary usage. *See, e.g.*, A. Rochvarg PRINCIPLES AND PRACTICES OF MARYLAND ADMINISTRATIVE LAW p. 6–7 (2011) (Maryland agencies subject to the State Administrative Procedure Act, MD.CODE. ANN., STATE GOV'T § 10–101, *et seq.*, exercise quasi-legislative, quasi-judicial, and declaratory functions.)

Commission's decision was a quasi-legislative action. Because it was quasi-legislative, our review is limited to whether the Commission was acting within the scope of its statutory authority. We hold that the Commission was. Finally, Appellant's right of procedural due process was not implicated by the temporary suspension of the County's Critical Area variance provision.

## A. Was the Commission's action quasi-judicial or quasi-legislative?

In his brief, Appellant states that, in deciding to suspend the variance provisions of the County's Critical Area program, the Commission was acting in a quasi-judicial capacity:

The Commission was not promulgating a new policy, rule or regulation or reviewing for approval a proposed county program or program amendment, all of which are quasi-legislative actions. As the minutes of its meeting and the letters of its Chair to the County Executive establish and other Commission documents confirm, the Commission's action was taken—in the Commission's own words—"to ensure effective implementation and enforcement of the County's Critical Area law with regard to variances." But, the Commission's action was not in response to any identified conflict in the County's overall variance program; rather it was precipitated entirely by the County's decision to process [Appellant's] second Buffer variance application and was taken to "provide time to figure out what to do" about the application.

(Footnotes and citations omitted.)

In response, the Attorney General asserts:

The deficiency in Wicomico County's program was not that the County could summarily reject [Appellant's] variance requests; rather, the deficiency was that the County could not summarily reject any repetitive variance requests. While that deficiency was brought to light by [Appellant's] case, the need for local programs to be able to obtain the removal of structures adjudicated to be unlawful lies at the heart of the Critical Area program that applies across all

Critical Area counties. Acting to advance such programmatic goals is the hallmark of quasi-legislative authority.

We agree with the Attorney General. Section 8–1809 sets out, in exacting detail, the scope of the Commission's authority to review and approve local Critical Area programs, *see* §§ (c), (d), (e), and (j), and amendments to local programs, *see* §§ (g), (h), and (i). In exercising its statutory authority to determine whether a local government's amendment to its Critical Area program is consistent with State law, the Commission acts in a quasi-legislative capacity. *See Talbot County v. Oxford,* 177 Md.App. 480, 493, 936 A.2d 374 (2007); *North v. Kent Island Ltd. P'ship,* 106 Md.App. 92, 103, 664 A.2d 34 (1995). The Commission suspended Wicomico County's authority to grant variances to Critical Area requirements pursuant to NR § 8–1809(*l* ). The Commission's authority under § 8–1809(*l* ) to require political subdivisions to correct "clear mistakes, omissions or conflicts" between a local Critical Area program and state law or regulations is part and parcel of the Commission's oversight function and is conceptually indistinguishable from the Commission's authority to review local government Critical Area programs and program amendments.

Appellant also argues that the Commission's action was not an exercise of its oversight authority but rather an *ad hoc* reaction to his variance application. For this reason, he asserts, the Commission did not act in a quasi-legislative capacity.

In this regard, the Court's opinion in *Talbot County v. Miles Point,* 415 Md. 372, 398–99, 2 A.3d 344 (2010), is instructive. In *Miles Point,* the Court considered two decisions by the Talbot County Council denying applications to amend that county's comprehensive water and sewer plan. Each case was initiated by an application by a property owner to amend the sewer service classification assigned to its property by the comprehensive plan. After separate public hearings, the county council issued decisions. While each decision contained findings of fact relating to the particular properties,

the decisions also analyzed broader policy concerns, *e.g.*, the available operating capacity of the wastewater treatment plants involved, the history of Talbot County's sewer capacity allocation policy, state environmental requirements, state and local "Smart Growth" policies, and the terms of the funding agreement between the Town of Easton (the operator of the plant involved in one of the applications) and the Department of the Environment. *Id.* at 388–89, 395–96, 2 A.3d 344. The County Council denied each application based upon combinations of the policy considerations described in the previous sentence. *Id.* One property owner appealed the Council's decision to the Talbot County Board of Appeals; the other filed a petition for administrative mandamus. The issue before the Court was whether either, both, or neither of these remedies were available to the property owners. *Id.* at 382–83, 2 A.3d 344. A threshold issue for the Court was whether the Council's decisions were legislative or adjudicative in nature. *Id.* at 387, 2 A.3d 344.

> Writing for the Court, Judge Adkins explained:
> [a]lthough we have recognized that "[t]he difference between adjudicative and legislative facts is not easily drawn[,]" *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 711–12 [376 A.2d 483] (1977), the proper classification of the Council's hearings in these cases is quite straightforward. Generally, adjudicative facts concern questions of "who did what, where, when, how, why, [and] with what motive or intent," while legislative facts "do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." *Id.* (quoting 1 Kenneth C. Davis, ADMINISTRATIVE LAW TREATISE § 7:02 (1958)).

*Id.* at 387–388, 2 A.3d 344.

When it applied this analysis to one of the cases before it, the Court concluded:

> All of the above facts relied upon by the Council were legislative in nature, as not one of the Council's grounds for decision was specifically rooted in the unique characteristics

of the Miles Point property or the associated development proposal. Throughout its findings of fact, the Council invariably chose not to focus on the merits and flaws of reclassifying Miles Point's specific property, but rather on how that reclassification would fit into Talbot County's overall policy on wastewater treatment. At no point did the Council indicate that there was a particular feature of the Miles Point property, or its development proposal, that made reclassification untenable; the Council's rationale could easily have applied to any [similarly classified] property . . . under the Plan.

To be sure, the ultimate decision reached by the Council specifically affected the Miles Point property. But this does not transform the Council's decision into adjudicatory action.

*Id.* at 391, 2 A.3d 344.[12]

We believe that much the same reasoning applies to the instant case. While the deficiency in Wicomico County's zoning ordinance was unquestionably brought to light by Appellant's application for another variance, the Commission's decision to suspend the County's authority to grant Critical Area variances was not based upon any peculiarity of Phillips Island but rather on a broader policy concern that could have arisen in connection with any property in the County containing a portion of the County's Critical Area buffer.

In sum, the Commission's decision that the County's Critical Area program contained "a clear mistake, omission or conflict with the Commission's law or criteria" was quasi-legislative. Because it was quasi-legislative in nature, our review " 'of that particular action is limited to assessing whether the agency was acting within its legal boundaries.' " *Oxford*, 177 Md.App. at 493–94, 936 A.2d 374 (quoting *County Council of Prince George's County v. Offen*, 334 Md. 499, 507, 639 A.2d 1070

---

**12.** The Court reached the same conclusion for the same reasons with regard to the other decision. *Id.* at 395.

(1994)). It is within this narrow standard that we will review the Commission's decision.

## B. Was the Commission's decision within the scope of its authority?

■ As we have explained, NR § 8–1809(*l* ) authorizes the Commission to determine that the County's program contained a clear mistake, an omission, or was in conflict with the "criteria or law." One of the Commission's criteria is that a local program be enforceable. COMAR 27.01.101.01.H. The Attorney General asserts, and we agree, that it was therefore acting within the scope of its authority.

Appellant counters that, even if the Commission's decision was quasi-legislative, "the Commission's actions were so arbitrary and capricious as to be beyond its legal boundaries, because they were not based on correct or relevant facts or law." He cites four cases, *Medstar Health v. Maryland Health Comm'n,* 376 Md. 1, 20–22, 25–27, 827 A.2d 83 (2003); *Judy v. Schaefer,* 331 Md. 239, 266, 627 A.2d 1039 (1993); *Oyarzo v. Dept. of Health,* 187 Md.App. 264, 288, 294, 978 A.2d 804 (2009); and *1000 Friends of Maryland v. Ehrlich,* 170 Md.App. 538, 550, 907 A.2d 865 (2006), as establishing the proposition that an agency, even when acting in a quasi-legislative capacity, is not acting within its legal authority if, in Appellant's words: "it does not recognize or disregards relevant, material facts; its action is not based on and consistent with relevant law; or its action has not been carried out in accordance with traditional standards of procedural and substantive fair play." His argument is unpersuasive. While these cases articulate a standard of review of quasi-legislative agency actions in terms different than did the Court of Appeals in *Offen,* 334 Md. at 507, 639 A.2d 1070, and this Court in *Oxford,* 177 Md.App. at 493–94, 936 A.2d 374, the distinctions have no substantial bearing on the outcome of this case. We begin with the authorities cited by Appellant.

In *Medstar Health,* the Court of Appeals considered whether the Maryland Health Commission ("MHC") exceeded its statutory authority in adopting a regulation that changed the

way in which the need for open heart surgical ("OHS") procedures was determined for the Washington Metropolitan Planning Region. 376 Md. at 16–17, 827 A.2d 83. Writing for the majority, Chief Judge Bell articulated the appropriate standard of review:

> While reliance upon the broad statutory authority conferred by the Legislature generally will be sufficient to justify an agency's regulation/rule making authority, logic compels the self evident conclusion that there is an outer limit to an agency's authority. This Court's attempt to demarcate the outer limits of an administrative agency's authority has focused on whether the regulations and rules promulgated by the agency are consistent with the statutory scheme under which the agency operates. So, too, with the Commission, the question is whether the regulation at issue is consistent with the underlying policy assumptions permeating the State Health Plan and the Commission's own factual analysis undertaken with the purpose of defining unmet need for cardiac surgery services.

*Id.* at 22, 827 A.2d 83.

The MHC regulation in question defined the "unmet need for cardiac services" by, in effect, deeming that the Washington Hospital Center had performed 2,126 OHS procedures in the year in question when, in fact, it had performed 2,950 OHS procedures. *Id.* at 25, 827 A.2d 83. This regulatory fiction would have allowed a suburban, Maryland hospital to establish an OHS program under the MHC's then-existing regulations. *Id.* at 26, 827 A.2d 83. There was no statutory authorization for permitting a hospital to offer such a program when, in fact, no need for the service existed, but the MHC reasoned that additional competition would reduce patient costs and improve the quality of care. *Id.* at 11–12, 827 A.2d 83. The Court held that the regulation exceeded the agency's authority because it was based upon a "palpable fiction" and was inconsistent with other MHS regulations. *Id.* at 27, 827 A.2d 83.

*Oyzaro* also involved a challenge to an agency's adoption of a regulation. Writing for this Court, Judge Meredith identified the appropriate scope of review as:

limited in scope to (a) whether quasi-legislative responsibilities have been properly granted to the agency, and (b) whether those responsibilities have been carried out in accordance with traditional standards of procedural and substantive fair play.

187 Md.App. at 288, 978 A.2d 804 (citing *Fogle v. H & G Restaurant*, 337 Md. 441, 453–54, 654 A.2d 449 (1995) and *Medstar*, 376 Md. at 20–21, 827 A.2d 83).

In *Judy v. Schaefer*, the Court considered a challenge to a decision by the Board of Public Works to reduce appropriations for public assistance programs. 331 Md. at 241, 627 A.2d 1039. The Court set out the appropriate standard of review:

Furthermore, the action was not the type of administrative determination which has been deemed "adjudicatory" or "quasi-judicial" under our cases. Consequently, the action is not subject to judicial review to determine whether it was arbitrary, capricious, or unsupported by substantial evidence.

The determination of the Governor and Board obviously was quasi-legislative in nature. Our review, consequently, is limited to assessing whether the [Governor and Board were] acting within [their] legal boundaries.

*Id.* at 266, 627 A.2d 1039 (citations and quotation marks omitted).

*1000 Friends* involved another challenge to a decision of the Board of Public Works. In order to approve funding for improvements to a portion of Route 32, the Board was required to determine that the project was warranted by "extraordinary circumstances."[13] 170 Md.App. at 542, 907 A.2d

---

13. The requirement is imposed by a provision of the State's "Smart Growth" law, codified at MD.CODE ANN., STATE FIN. & PROC. § 5–7B–01 *et seq.* (1985, 2006 Repl.Vol.). The law provides that, before the State can fund certain kinds of transportation projects outside of designated "growth areas," the Board must determine that "extraordinary circumstances" warrant funding. SFP § 5–7B–05(a)(1). "Extraordinary circumstances" is defined in SFP § 5–7B–05(a)(2), which reads in pertinent part:

865. The Board's decision that extraordinary circumstances warranted the Route 32 project was challenged, among other reasons, on the basis that the Board was required to make specific findings of fact. *Id.* at 544, 907 A.2d 865. This Court explained why the argument was unavailing:

> In approving funding of a growth-related project, the Board is not adjudicating a contested case involving fundamental rights of life, liberty, or property.[ ] Rather, it is performing a "quasi-legislative" function, such as promulgation of a regulation or approving a budget. "[W]here . . . the action is quasi-legislative in nature, the concepts applicable to an adversary proceeding have no relevance." *Union Investors*, [*Inc., v. Montgomery County*, 244 Md. 585] 588 [224 A.2d 453 (1966) ]. Any requirement to issue findings of fact does not apply to the Board in this case.

> The Board held a meeting at which it heard statements from, among others, representatives of the Department [of Transportation] as to whether the project satisfies the requirements for "extraordinary circumstances." The Board then voted 2–1 to approve the project for funding. In our view, the Board's actions satisfied its plain duty under the statute.

*Id.* at 549–551, 907 A.2d 865 (footnote and some citations omitted).

Returning to the case before us, Appellant asserts that the Commission's decision failed to satisfy the tests articulated in *Medstar Health, Oyarzo, Judy* and *1000 Friends* because the Commission's action was based upon an erroneous understanding of the facts as well as erroneous legal advice from the Commission's staff. Moreover, he contends that the Commis-

---

In order to determine that extraordinary circumstances exist . . ., the Board shall determine by a majority vote that:
(i) the failure to fund the project in question creates an extreme inequity, hardship, or disadvantage that clearly outweighs the benefits from locating a project in a priority funding area; and
(ii) there is no reasonable alternative for the project in a priority funding area in another location within the county or an adjacent county.

sion's action violated traditional standards of fair play because it deprived him of his ability to pursue a variance application. As a result, Appellant asserts, the Commission's decision was so arbitrary and capricious that it was beyond the boundary of the Commission's legal authority.

In furtherance of his argument, Appellant contends that the minutes of the relevant Commission meeting do not reflect that the Commission was informed that the County had already ordered Appellant to remove the buildings, that he had agreed to do so, and that he "had already prepared and submitted the [structure removal and the buffer management plans] required by the County providing for the removal of all six buildings, five of them immediately." Moreover, he asserts that the Commission was not informed that the Executive Director had directed the County's staff not to review his structure removal and buffer management plans.[14] Finally, as to the variance application pending before the County, Appellant states that the Executive Director of the Commission "presented the matter in a manner suggesting that [Appellant] had 'reapplied' for the same, six-building, hunting-camp variance which had previously been denied." This error was compounded, he continues, by the Commission Counsel's statement to the Commission that Appellant " 'was reapplying for a variance for which he was turned down'—clearly not the case at all." Citing *Medstar Health,* 376 Md. at 25–27, 827 A.2d 83, Appellant asserts that the Commission's decision lacked any reasonable factual basis and thus exceeded the Commission's legal authority. This argument is not persuasive.

To begin with, because it was discharging a quasi-legislative function, the Commission was under no obligation to create a record to support its decision. *Union Investors,* 244 Md. at 588, 224 A.2d 453; *1000 Friends,* 170 Md.App. at 550, 907 A.2d

---

14. There was conflicting deposition testimony as to whether the Executive Director intended to direct the County staff not to review Appellant's plans or merely to suggest that they need not do so. For purpose of analysis, we assume the former.

865.  Instead, the Board's decision, reflected in its meeting minutes, is sufficient to satisfy "its plain duty under the statute." *Id.* at 551, 907 A.2d 865.  Moreover, as illustrated by this Court's analysis in *1000 Friends,* Appellant's arguments are irrelevant to the judicial review of an agency's quasi-legislative action.  We do not consider whether the agency's decision was arbitrary, capricious or unsupported by substantial evidence, which is, in effect, what Appellant is requesting us to do.  Rather, we decide whether the agency "was acting within [its] legal boundaries." *Judy,* 331 Md. at 266, 627 A.2d 1039; *accord, Fogle,* 337 Md. at 453–54, 654 A.2d 449; *Oyarzo,* 187 Md.App. at 288, 978 A.2d 804.  In this regard, the Commission was unquestionably acting within the scope of the explicit authority granted to it by NR § 8–1809($l$)(1).  *Medstar Health* is of no assistance to Appellant because, in that case, the regulation was invalidated because it was based upon factual premises that were (1) non-existent and (2) contrary to the MHC's own factual findings contained in another regulation promulgated by the agency.  376 Md. at 25–26, 827 A.2d 83.  The situation in the case before us is fundamentally different because the Commission's decision was clearly premised upon a factual basis—even if Appellant disputes the Commission's interpretation of those facts—and was not inconsistent with any regulation promulgated by the agency.

Appellant also contends that the Commission's decision was not based "on relevant or correct law."  This argument is also based on the minutes of the May 7, 2008 Commission meeting.  He asserts that the minutes do not reflect that the Commission staff advised the Commission as to any specific provision of the Critical Area law that would have prohibited the County from "merely holding a hearing on [his] new variance application."  He states that "there was no evidence or suggestion" that the County's program was inconsistent with the Critical Area law or that the County was interpreting and administering its program in a manner different that of other jurisdictions.

This argument is unpersuasive on several levels. First, as we have discussed, because it was acting in a quasi-legislative capacity, the Commission was under no obligation to create a record to justify its decision.[15] Once we have satisfied ourselves that the agency was acting within the scope of its authority and not otherwise contrary to law, our review ends.

Second, Appellant's argument misstates the basis of the Commission's decision. The problem confronting the County and the Commission was not a lack of enforcement remedies but the County's perception that, as long as a variance application was pending, the County was constrained in its ability to pursue a prompt and effective enforcement action. The criteria adopted by the Commission for local plans includes a requirement that those plans be enforceable. COMAR 27.01.10.01.H. The existence of the variance application necessarily complicated enforcement proceedings if for no other reason than because it gives a property owner a colorable basis for requesting a stay of enforcement proceedings until the variance application is finally decided, a process that can take years, as the history of this case illustrates. Moreover, as Commission Counsel pointed out to the Commission, if the second application were to be denied, there was nothing in the County's Critical Area program to prevent Appellant from filing a third, as long as he waited one year from the final decision on the second. The substantial basis of the Commission's reasoning was underscored, albeit after the Commission's decision, by the County Executive's May 28, 2008 letter

---

**15.** In his brief, the Attorney General correctly points out that Appellant's argument is based upon "isolated phrases ... used at different points in the minutes to suggest that the members of the Commission must have been misled.... There is no testimony from any member of the Commission, no affirmative misstatement in the minutes—in short, no evidence whatsoever—indicating that anyone on the Commission misunderstood what [Appellant's] new variance request encompassed."

The Commission's minutes do not purport to reflect every statement made during the course of a meetings. There is no requirement that they do so. *See* State Government Article § 10–509(c) (The minutes of a meeting of a public body "shall reflect: (i) each item that the public body considered; (ii) the action that the public body took on each item; and (iii) each vote that was recorded.")

to the Commission Chair stating that the County shared "the Commission's concern for the potential of 'endless recycling of variance applications.'"

Appellant also contends that, in her deposition, the Commission Chair misstated the concept of *res judicata* as it applies to administrative proceedings. From this, he argues that "the Commission's sanction of [the County's] variance program .... was based on an erroneous interpretation and application of an external body of common law—the doctrine of res judicata." Assuming *arguendo* that the Chair's articulation of the principles of administrative *res judicata* was lacking in some fashion, her personal views on that subject are irrelevant. The Chair's duties do not extend to providing legal advice to the Commission; that role is reserved to the Commission's counsel. *See* NR § 8–1805(c) (the Commission's staff includes a designated "assistant Attorney General to advise and represent the chairman and the Commission"). There is nothing in the record to suggest that anyone other than the Commission Counsel gave legal advice to the Commission or its staff regarding the County's variance procedures.

▮ Finally, Appellant argues that the Commission's decision was not made "in accordance with traditional standards of procedural and substantive fair play" because the Commission's decision deprived him of his right to a hearing on the merits of his second variance application. In his brief, he states:

> The Commission exceeded its authority under NR § 8–1809(*l*)(1) when it mandated that Wicomico County "shall not accept or process any variance application," and when the Assistant Attorney General wrote the Board of Appeals chair requesting the Board "to refrain from taking any action" with regard to [Appellant's] new variance application. There is no mention of "hearings" in NR 8–1809(*l*)(1) and no language that authorized the Commission or its representatives to instruct Wicomico County not to hold a hearing. It only authorized the Commission to request

Wicomico County to submit a proposed program amendment or refinement to correct the deficiency alleged to exist.[1] By exceeding its statutory authority, the Commission acted beyond its legal boundaries.

And by causing the County to deny [Appellant] a variance hearing, the Commission's action deprived [Appellant] of his right to due process.

(Citations and footnote omitted.)

We do not agree. Section 1809(*l*)(3) states that["l]ocal project approvals granted under a part of a program that the Commission has determined to be deficient shall be null and void after notice of the deficiency." Appellant cannot be fairly said to have been injured by this action because, as the statute makes clear, even if the County Board of Appeals had conducted a hearing and voted to grant the variance, the variance would have been null and void. Due process did not require a hearing on Appellant's variance application because the relief he sought was already barred as a matter of law. *See Connecticut Dep't of Public Safety v. Doe,* 538 U.S. 1, 8, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003) (Procedural due process does not require an agency to provide a hearing when the statute in question precludes a favorable outcome without exception.).

## II. The non-review of Appellant's structure removal and buffer management plans

Appellant next takes issue with the Commission Chair's May 7, 2008 letter to the County Executive, which the Chair informed the County Executive that the Commission had determined that the County's Critical Area program was deficient because it "lacks provisions to ensure effective implementation and enforcement of the County's Critical Area law with regard to variances." The letter further explained that, in the view of the Commission, the absence of a provision "to prevent the endless recycling of various applications is a clear omission under Natural Resources Article § 8–1809(*l*)." The letter further stated that, until the County corrected the

omission, "the County may not accept or process any [Critical Area] variance application. . . ."

Appellant asserts that the Commission's instruction to the County not to review his proposed structure removal and buffer management plans interfered with the County's ability to enforce its zoning ordinance and prevented him from complying with the law. From that premise he states that the injunctive relief sought by the Attorney General is unnecessary because he "has demonstrated his desire and intent to remove the buildings."

The dispositive flaw in Appellant's argument is that the plans actually submitted by him did nothing of the sort. As we have explained, Appellant proposed to remove five of the six buildings on the Island immediately but to defer removal of the sixth building until after his variance application was decided. If the variance application had been granted, he would not have removed Building No. 1. His willingness to partially, but not fully, comply with the law is not a defense to the Attorney General's enforcement action.

The circuit court did not err in granting the Attorney General's motion for summary judgment and denying Appellant's.

**THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY IS AFFIRMED.**

**APPELLANT TO PAY COSTS.**