*In the Matter of Concerned Citizens of PG County District 4, et al.*, No. 0472, Sept. Term 2021.  Opinion by Adkins, Sally D., J.

**LAND USE ARTICLE—SECTION 22-201(b)(2)(i) —UNIFORMITY:**  Maryland Code, § 22-201(b)(2)(i) of the Land Use Article requires zoning laws to be "uniform for each class or kind of development throughout a district or zone."  This uniformity requirement requires zoning laws to be equally applicable to similarly situated properties and be reasonable and based upon the public policy to be served.

Because the bill at issue—effectuating a text amendment to the county zoning law—was not reasonable and based upon the public policy to be served, it violates the uniformity requirement.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0472

September Term, 2021

_____

IN THE MATTER OF
CONCERNED CITIZENS OF
PG COUNTY DISTRICT 4, ET AL.

_____

Wells, C.J.,
Beachley,
Adkins, Sally D.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Adkins, Sally D., J.
_____

Filed:  June 29, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal presents a challenge to a text amendment enacted by the Prince George's County District Council ("Council") involving density in land use.[1] CB-17-2019 ("CB-17" or "Bill") effectuates a text amendment to § 27-441(b) of the Prince George's County Zoning Ordinance (hereinafter "Zoning Ordinance")[2] that allows—under certain circumstances—high-density townhouses to be constructed in the Residential-Agricultural ("R-A") Zone.

Concerned Citizens of Prince George's County ("Appellants") filed a petition for judicial review of the Council's decision to enact CB-17 alleging that the Bill was a site-specific text amendment implemented for the sole purpose of benefitting the Freeway Airport property and Appellee, Freeway Realty, LLC. The Circuit Court for Anne Arundel

---

[1] Maryland Code, § 22-101 of the Land Use Article provides that the District Council for Montgomery and Prince George's County consists of their respective county councils and governs the portion of their counties established by The Maryland-Washington Regional District Act. Md. Code (1957, 2012 Repl. Vol.), Land Use § 20-101; *see also* Land Use § 22-104. These provisions grant the two counties authority to regulate land in those parts of the Maryland-Washington Regional District located within their respective geographical borders. Land Use §§ 20-101, 22-104.

[2] Zoning Ordinance refers to the ordinance codified as Subtitle 27 of the Prince George's County Code at the time this lawsuit began, not the new Zoning Ordinance that went into effect on April 1, 2022. The April 1 Ordinance still allows for development under the Zoning Ordinance in place at the time this lawsuit began. *See, e.g.*, April 1 Ordinance § 27-1902 ("[The District] Council recognizes that such immediate, wholesale implementation of this Subtitle may not be feasible or appropriate in all circumstances. Accordingly, the purpose of this Section is to provide, for a limited time period, a process to apply the requirements of the prior Zoning Ordinance (Subtitle 27, Prince George's County Code, 2019 Ed.)"); April 1 Ordinance § 27-1903(c) ("Development proposals or permit applications of any type for properties in all other zones of the County [other than TDOZ or DDOZ] may utilize the prior Zoning Ordinance or Subdivision Regulations for development of the subject property"). Therefore, this appeal is still ripe for review.

County affirmed the decision of the Council to enact CB-17. On appeal, Appellants present us with the following questions:

1. Did the District Council's enactment of CB-17-2019 violate the uniformity requirement of Maryland Code, Land Use Article, Regional District Act?

2. Did the District Council's enactment of CB-17-2019 violate the "special law" prohibition of the Maryland Constitution?

3. Did the District Council's enactment of CB-17-2019 constitute unlawful "spot" zoning?

4. Was the District Council's enactment of CB-17-2019 an unlawful grant of relief to Freeway Airport from the use and density restrictions of the R-A zone without the required administrative, quasi-judicial procedure?

5. May the District Council's enactment of CB-17-2019 be affirmed on the basis of "public interest" or "public benefit"?

Because we answer yes to question one, we reverse the decision of the circuit court.

## FACTS AND PROCEDURAL HISTORY

*Freeway Airport*

Freeway Airport has been a part of the Prince George's County community since it began operation in 1947. The airport—located on a 129-acre property whose address is 3900 Church Road in Bowie, Maryland—is situated within an R-A zone. The purposes of the R-A zone are: (1) "[t]o provide for large-lot one-family detached residential subdivisions, while encouraging the retention of agriculture as a primary land use"; (2) "[t]o encourage the preservation of trees and open spaces"; and (3) "[t]o prevent soil erosion and stream valley flooding." Zoning Ordinance § 27-426(a). Although operation

-2-

of an airport is not allowed in an R-A zone, Freeway Airport has been a certified nonconforming use since 1968.

Kim Rodenhouser, whose family owns Freeway Airport, testified before the Council and community members regarding the history and challenges the airport has faced throughout the years. A power company installed high-tension lines to the west of the Freeway Airport property in the 1960s over the family's objections about detriment to their business. The aftermath of the September 11, 2001 tragedy also severely impacted the Freeway Airport business, as they were closed for 103 days. Due to these detrimental impacts on the Freeway Airport business, the Rodenhousers plan to seek financial recourse by either ramping up airport activity—through more flights, lessons, and increased operations—or finding a cost-beneficial way to utilize the property in a manner other than running an airport.

The Rodenhausers say that they seek to redevelop the property with quality townhouses because their other economic alternative—increasing airport activity—could pose a public safety issue on the surrounding residential areas.[3] In order to further this townhouse redevelopment plan, Appellee Freeway Realty, LLC[4] would need to proceed through the re-zoning or sectional map amendment process, as townhouses were not permitted in the R-A zone. The District Council, however, eliminated this need by passing CB-17.

---

[3] Since 1983, Freeway Airport has been involved in at least 32 accidents that have been documented by the National Transportation Safety Board.
[4] Freeway Realty, LLC is a subsidiary of St. John Properties, Inc.

*Implementing CB-17*

   *a. Draft 1*

CB-17 amends § 27-441(b) of the Zoning Ordinance. The first draft of CB-17 was introduced before the Council on April 30, 2019. CB-17 was "[f]or the purpose of permitting Townhouse and One-family detached dwelling uses in the R-A (Residential Agricultural) Zones of Prince George's County, *under certain circumstances*." (emphasis added). Draft 1 of CB-17 would have allowed townhouses to be used in an R-A zoned property if the assemblage of land: (1) was no more than 140 acres; (2) was located within one mile of a municipal boundary; (3) was formerly used as an airport; and (4) had frontage on a public right of-way classified as arterial or higher in the Master Plan of Transportation.

The Bill was before the Planning, Housing and Economic Development Committee ("Planning Committee") on June 6, 2019, but was put on hold while changes were made to the Bill. CB-17 was before the Planning Committee again on June 20, 2019. The Committee had received numerous letters of opposition to the initial draft of CB-17 and a variety of constituents spoke before the Committee to express their opposition. Most opposing speakers brought up concerns with the proposed allowable use of the Freeway Airport property. Largely they asserted that adding hundreds of townhomes—and thus hundreds of cars—to an already overloaded infrastructure on the Church Road corridor would only increase existing dangerous traffic conditions.

In addition to constituent opposition to the Bill, the Council received opposition from the City of Bowie, Prince George's County Planning Board, and Prince George's County Office of Law. The Office of Law provided comment on the Bill stating that it

would be "subject to challenge as it appears to be drafted for a specific parcel" *i.e.*, the Freeway Airport property. The Planning Board opposed CB-17 because it also believed the Bill was drafted for a specific property—the Freeway Airport. The Planning Board noted that, at the time it submitted its recommendation, 262 properties met the criteria of being less than 140 acres, within one mile of a municipal boundary, and having frontage on a public right of-way classified as arterial or higher. But, with the requirement that the property must have formerly been used as an airport, only one assemblage of land would qualify—Freeway Airport.[5] The Planning Board further noted that allowing townhouses in the R-A zone was not congruent with the zone's prescribed purpose.

Some speakers, including Kim Rodenhauser and Robert Antonetti, a lawyer on behalf of Freeway Airport, spoke in favor of CB-17. Ms. Rodenhauser provided a brief history of Freeway Airport's operation and how "[t]his legislation would benefit [her] family." Mr. Antonetti spoke about the public safety issues involving the operation of the airport near residential homes and the history of accidents involving planes to and from the airport. Mr. Antonetti stated that this Bill "would absolutely motivate the permanent closure of this airport." At the end of the public hearing, after considering proposed amendments by the Planning Board and Zoning Hearing Examiner, the Committee approved a motion to move forward with a new Draft 2 of CB-17 by a vote of 3-2.

*b. Draft 2*

---

[5] The Planning Board noted that—at the time it submitted its recommendation—there were four operating airports in Prince George's County.

Draft 2 of CB-17 eliminated the requirement that the land be formerly used as an airport. This draft, if implemented, would add—in relevant part—the following footnote to § 27-441(b) of the Zoning Ordinance regarding uses in the R-A zone:

> Notwithstanding any other provision of this Part, townhouses and one-family detached dwellings are a permitted use, provided:
>     (a) The use is located on an assemblage of land that:
>         (i)     is no less than one hundred (100) acres and no more than one hundred fifty (150) acres in size;
>         (ii)    is located within one (1) mile of a municipal boundary;
>         (iii)   is within 2,500 feet of land used for purposes of electrical generation, transmission, and distribution in connection with providing public utility service in the County by a regulated public utility; and
>         (iv)   has frontage of a public right-of-way classified as a freeway or higher in the Master Plan of Transportation and is maintained by the State Highway Administration.

After a second and third reading and public hearing, no action was taken on the Bill after hearing comments from the public.[6]

### c. Draft 3

The Council considered Draft 2 of CB-17 again on October 8, 2019. A new Draft proposed a substantive amendment to add back the "formerly used as an airport" language—but using the language in the conjunctive. Draft 3 of CB-17 would allow

---

[6] Before the third reading of the Bill and public hearing took place, the County Council adopted resolutions regarding amendments to the 2008 Water and Sewer Plan on July 23, 2019. Mr. Antonetti, on behalf of Freeway Airport, submitted a Statement of Justification in Support of Application For Water and Sewer Plan. Appellees ask this Court not to consider Joint Record Extract pages 319–45 and the section of Appellants' brief titled "The 2019 Sewer and Water Plan Amendments for 44 Detached Homes" as they are not part of the administrative record for CB-17. We do not address this issue as we did not rely on these documents in coming to our decision.

townhouses in the R-A zone if the use is located on an "assemblage of adjacent properties" that:

> (i)    is no less than one hundred (100) acres and no more than one hundred fifty (150) acres in size or was formerly used as an airport;
> (ii)    is located within one (1) mile of a municipal boundary;
> (iii)    is within 2,500 feet of land used for purposes of electrical generation, transmission, or distribution in connection with providing public utility service in the County by a regulated public utility; and
> (iv)    a portion of the boundary of the assemblage of adjacent properties has frontage on a public right-of-way classified as a freeway or higher in the Master Plan of Transportation and is maintained by the State Highway Administration.

The Planning Board submitted another letter to the Council opposing Draft 3 of CB-17. In its letter, the Planning Board noted it was unable to identify all properties that could take advantage of Draft 3 of CB-17 as it did not have records on land "formerly used as an airport" and could not determine what is meant by "assemblages of properties." That Board further noted that townhomes are not appropriate in the R-A zone and that it believed "this [B]ill was drafted for a specific property." The Planning Board recommended the property go through "the Sectional Map or Zoning Map Amendment process to rezone the property" if the owners wanted to build townhouses on the property.

*d. Final Bill*

Notwithstanding considerable constituent and Planning Board opposition, the District Council enacted CB-17 on November 19, 2019 by a vote of 7 to 4 after a final

public hearing. CB-17, as enacted, adds Footnote 135[7] to § 27-441(b) of the Zoning

Ordinance that adds formerly excluded townhouses as a permitted use in the R-A zone if:

> (a) The use is located on an assemblage of adjacent properties that:
> (i) is no less than one hundred (100) acres and no more than one hundred fifty (150) acres in size or was formerly used as an airport;
> (ii) is entirely within one (1) mile of a municipal boundary;
> (iii) is entirely within 2,500 feet of land owned by a regulated public utility and used for purposes of electrical generation, transmission, or distribution in connection with providing public utility service in the County by a regulated public utility; and
> (iv) a portion of the boundary of the assemblage of adjacent properties has frontage on a public right-of-way classified as a freeway or higher in the Master Plan of Transportation and is maintained by the State Highway Administration.[8]

CB-17 would allow a density that is nine times greater than what is currently permitted for

R-A zoned properties—allowing up to 4.5 dwelling units per acre instead of 0.5 one-family

detached dwellings per acre.[9] Zoning Ordinance § 27-442(h).

---

[7] There is some discrepancy in identifying the number of the Footnote. Appellants' primary brief says it is Footnote 134. Some record documents say it is in Footnote 135. The Zoning Ordinance—provided online through Prince George's County's website—codifies the text amendment implemented through CB-17 as Footnote 136. We have been unable to obtain an up-to-date print version of the Prince George's County Code to confirm the numeration of the footnote adding CB-17.

[8] CB-17 further provides:

> Regulations concerning the net lot area, lot coverage and green area, lot/width frontage, yards, building height, density, accessory buildings, private streets, minimum area for development, and other requirements of the R-A Zone shall not apply. . . . All other regulations for the R-T Zone . . . shall apply[.]

[9] CB-17 also allows qualifying properties to follow the regulations of the Residential-Townhouse ("R-T") Zone that do not conflict with the other requirements outlined in CB-17.

On December 16, 2019, Appellants filed a Petition for Judicial Review in the Circuit Court for Prince George's County requesting reversal of the District Council's decision to enact CB-17. In September 2020, the case was transferred to the Circuit Court for Anne Arundel County. The Circuit Court for Anne Arundel County affirmed the District Council's decision. This timely appeal followed.

## STANDARD OF REVIEW

Upon reviewing a final decision of the District Council, a court may reverse or modify the decision if the District Council's action is "(i) unconstitutional; (ii) in excess of the statutory authority or jurisdiction of the district council; (iii) made on unlawful procedure; (iv) affected by other error of law; (v) unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or (vi) arbitrary or capricious." Md. Code, § 22-407(e)(3) of the Land Use Article.[10]

## DISCUSSION

*Cases on uniformity in general*

---

[10] Appellees contend that the Prince George's County Council, sitting as the District Council, is acting as an administrative agency in its quasi-legislative capacity. *See Cnty. Council of Prince George's Cnty. v. Brandywine Enters., Inc.*, 350 Md. 339, 342 (1998) (citing *Montgomery Cnty. v. Revere*, 341 Md. 366, 384 (1996)) (holding that the District Council is acting as an administrative agency). Citing *Lewis v. Gansler*, 204 Md. App. 454 (2012), Appellees assert that the District Council's quasi-legislative decisions are subject to judicial review that is "the narrowest in scope and most deferential to the agency." *See also Armstrong v. Mayor & City Council of Baltimore*, 169 Md. App. 655, 668 (2006). Section 22-407(e)(3) of the Land Use Article explicitly sets forth the standards for when courts may reverse or modify the District Council's action. These standards apply whether the District Council was acting within a quasi-judicial or quasi-legislative capacity. Therefore, we look to the statute for our standard of judicial review.

Appellants ask this Court to reverse the District Council's decision in passing CB-17 by finding it unlawful in multiple respects. They allege that CB-17: (1) violates the uniformity requirement of Land Use § 22-201(b)(2)(i); (2) is an unconstitutional special law prevented by Article III, § 33 of the Maryland Constitution; (3) is illegal spot-zoning; (4) was enacted without following proper procedure; and (5) is not necessary for the public interest. We need not address every issue, as we resolve this appeal by focusing on the uniformity requirement.

Section 22-201(b)(2)(i) of the Land Use Article requires zoning laws to be "uniform for each class or kind of development throughout a district or zone." [11] This requirement, known as the "uniformity" requirement, is meant to protect landowners "from arbitrary use of zoning powers by zoning authorities." *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 538 (2002). The reasoning behind this requirement is that "the motives or wisdom of the legislative body in adopting an original or comprehensive zoning plan enjoy a strong presumption of correctness and validity." *Id.* (citing *Norbeck Vill. Joint Venture v. Montgomery Cnty. Council*, 254 Md. 59, 65–66 (1969)). "Frankly put, the requirement of uniformity serves to protect the landowner from favoritism towards certain landowners within a zone by the grant of less onerous restrictions than are applied to others within the same zone elsewhere in the district[.]" *Rylyns Enters., Inc.*, 372 Md. at 536.

---

[11] Land Use § 22-201(b)(2)(ii) further provides that "zoning laws in one district or zone may differ from those in other districts or zones." For example, this allows for different laws between the R-A zone in District 4 and the R-A zone in District 3. But zoning laws must be uniform throughout the R-A zone in District 4. *See* Land Use § 22-201(b)(2)(i).

As recognized in *Anderson House, LLC v. Mayor & City Council of Rockville*, Maryland courts have not fully elaborated on the meaning of the uniformity requirement. 402 Md. 689, 714 (2008). In *Anderson House*, the Court of Appeals looked to the analysis used in other states on this issue, as the uniformity requirement applies in most states' zoning laws. *See id.* at 713 (citing 1 Robert M. Anderson, *American Law of Zoning*, 417 (3d ed. 1986)).

> Many jurisdictions agree that the kind of discrimination violative of the uniformity requirement occurs when a zoning ordinance singles out a property or properties for different treatment than others similarly situated. At the same time, those jurisdictions tend to find no violation of the uniformity requirement when zoning regulations are equally applicable, although their application produces varying restrictions and results across properties in the same zoning category.

*Anderson House, LLC*, 402 Md. at 714.

In *Neighbors in Support of Appropriate Land Use v. Cnty. of Tuolumne*, the Fifth District of the California Court of Appeal explained that the uniformity requirement is akin to a contract enforcement clause "allowing parties to the contract to challenge burdens unfairly imposed on them or benefits unfairly conferred on others." 157 Cal. App. 4th 997, 1009 (2007) (noting that the uniformity requirement, as provided in a leading California treatise on land use, "is intended to prevent unreasonable discrimination against or benefit to particular properties within a given zone"). The fundamental importance of the uniformity requirement should not be understated. *See Augenblick v. Town of Cortlandt*, 104 A.D.2d 806, 814 (N.Y. App. Div. 1984) (Lazer, J., dissenting) ("Uniformity is fundamental to 'Euclidian' zoning by which a community is divided into basic use categories such as residential, commercial and industrial (6 Rohan, Zoning and Land Use

Controls, § 40.01[1]; *see Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303).”), *rev'd,* 488 N.E.2d 109 (N.Y. 1985) (adopting dissenting opinion).

In its analysis of the uniformity requirement, the *Anderson House* court considered two New Jersey cases. In *N.T. Hegeman Co. v. Mayor & Council of Borough of River Edge*, 69 A.2d 767 (N.J. Super. Ct. Law Div. 1949), an ordinance violated the uniformity requirement when it imposed a 25-foot setback requirement throughout the business district classification, except for one block that was required to have a setback of 67 feet. On the other hand, in *Rumson Ests., Inc. v. Mayor & Council of Borough of Fair Haven*, 828 A.2d 317 (N.J. 2003), an ordinance that “used a mathematical formula to determine minimum lot sizes and maximum lot coverage based upon the steepness of slopes on properties did not violate the uniformity requirement” despite having varying results based upon each parcel's characteristics. *Anderson House, LLC*, 402 Md. at 714. The New Jersey Supreme Court held that the ordinance did not violate the uniformity requirement because it was *reasonable* to differentiate between properties in this manner. *See Rumson Ests.*, 828 A.2d at 329–30.

Like New Jersey, in Maryland, for a zoning ordinance to meet the uniformity requirement, it must be equally applicable to similarly situated properties. *See Anderson House, LLC*, 402 Md. at 714. Additionally, the zoning ordinance must be “reasonable and based upon the public policy to be served.” *Montgomery Cnty. v. Woodward & Lothrop, Inc.*, 280 Md. 686, 720 (1977) (citing *Quinton v. Edison Park Dev. Corp.*, 285 A.2d 5 (N.J. 1971)); *see also Augenblick v. Town of Cortlandt*, 104 A.D.2d 806, 814 (N.Y. App. Div. 1984) (Lazer, J., dissenting) (“An ordinance will be held to uniformity if the record does

-12-

not disclose any reasonable basis for different treatment"), *rev'd*, 488 N.E.2d 109 (N.Y. 1985); *Charter Twp. of Oshtemo v. Cent. Advert. Co.*, 336 N.W.2d 823, 826 (Mich. Ct. App. 1983) ("Allowing classification within a district as long as they are reasonable"). To determine reasonableness, the Court considers the terms of the ordinance, rather than its application. *Woodward & Lothrop, Inc.*, 280 Md. at 720.

Appellees assert that CB-17 does not violate the uniformity requirement because CB-17 is equally applicable to all R-A zoned properties that meet the requisite criteria. In essence, they allege that any R-A zoned property would qualify for townhome redevelopment if it is 100 to 150 acres or was formerly used as an airport, within one mile of a municipal boundary, entirely within 2,500 feet of an electric generating public utility, and bordering a right-of-way classified as freeway or higher. The parties dispute whether any properties—other than Freeway Airport—meet the CB-17 criteria. The Planning Board, in its letter report, noted that it could not determine whether other such properties existed. The District Council did not address this question, and it was unnecessary for it to do so. We need not consider whether other properties exist. *See Anderson House, LLC*, 402 Md. at 714 (noting that the uniformity requirement can be violated when "a zoning ordinance singles out a property or properties"). Rather, the pertinent issue is not whether some other properties might qualify under the criteria, but whether creation of special areas

for increased density is reasonable and based upon the public policy to be served.  *See Woodward & Lothrop, Inc.*, 280 Md. at 720.[12]

*‘Reasonable and based upon public policy’ standard*

To help resolve this question we now return to some of the above-cited uniformity cases.  In *Rumson Ests.*, it was reasonable to differentiate properties' maximum lot size based upon the steepness and slope of the property because the local council sought to prevent "monster homes" from being built that would infringe on the "light, air and open space" of neighboring properties and to promote diversification of housing stock.  828 A.2d at 330.  In *Oshtemo*, it was reasonable to only allow billboards in a "C" zone within 150 feet of a highway or business route because the impact of competition between billboards is lessened and driving patterns are different on a highway than elsewhere in the zone.  336 N.W.2d at 826.  In *Woodward & Lothrop*, regulating the height, area, and use of properties within the Friendship Heights Central Business District was considered reasonable to not "overload the existing transportation system," to stabilize air quality, to allow for more green spaces, and to ensure that future development will result in a quality of life that is appropriate for the areas.  280 Md. at 699–701, 721.  The criteria and restrictions in these cases all have a legitimate public purpose and are "reasonable and based upon the public policy to be served."  *See id.* at 720.

---

[12] The record does reveal that there is other undeveloped property close to the airport property that fails to qualify for the higher density.  Although existence of non-qualifying neighboring properties is not the proper test either, this proximity helps give perspective as we examine the terms of CB-17 under a uniformity analysis.

The record is highly suggestive that the purpose intended by the District Council in enacting CB-17 was to create an incentive—in the form of a higher density zoning—for the owner of Freeway Airport to close its operations. Yet, as the cases establish, in analyzing uniformity, our main focus is not on the minds of the District Council. Rather we examine objectively the law and its relation to public policy. To discern public policy, we look first to the Bill itself. In its purpose statement the Bill states that it is, "[f]or the purpose of permitting Townhouse and One-family detached dwelling uses in the [R-A] Zones of Prince George's County, under certain circumstances." Because that language is not helpful to explain the purpose for this change in density, we turn to the purposes offered by the Appellees in their brief.

In explaining the purpose of the ordinance, Appellees first state that another R-A zoned property near the airport known as Woodmore, "has townhomes, very upscale townhomes[.]" Second, Appellees point to statements by the Bill's sponsor that he and the County have been aware of the inherent dangers associated with the airport for more than 20 years and that they "decrease[d] the density [around the airport] because of the fatalities that occurred in APZs 1 and 2 and at the end of the runways[.]"[13]

As to the first reason, the Director for the City of Bowie—speaking in opposition to CB 17—testified about why Woodmore Golf Course Community could not justify the Bill.

---

[13] Appellees also offered as a "purpose" that the Bill approved "no specific development." We do not understand how this can be a policy purpose—it only explains that there are more steps in the development process. Nonetheless, the ordinance increases entitlement to density for development of the property more than nine-fold; that no specific property was offered for development approval is not relevant.

-15-

He explained that Woodmore—developed under a different section of the Zoning Ordinance—had townhomes, but its density was only one-half unit per acre, not the nine units per acre allowed by this Bill. There is no dispute in the record about the large discrepancy in density allowed under CB-17 and that allowed for the Woodmore Community. Thus, if the District Council's purpose was to make the airport property equivalent to Woodmore, there is no reasonable justification to increase the allowable density so dramatically.[14] We conclude that the proximity of the Woodmore development and its lower-density townhomes does not provide any reasonable explanation—from a public policy standpoint— of CB-17's allocation of higher density to these 129 acres that lie within the low-density R-A zone.

As to the second proffered purpose for CB-17, proponents of the Bill presented considerable evidence before the District Council that Freeway Airport—since 1983—had a record of 32 accidents, including 10 fatalities, and that some citizens living nearby had fears of future accidents. Incongruously, representatives of the family owning Freeway Airport who were proponents of the Bill testified that they would consider closing the airport only if the airport property was given the requested higher density—but without that, they intended to *intensify* airport usage to make it profitable. In essence, Appellees argue that public interest in closing the airport—based on a history of accidents—overrides

---

[14] The Planning Board's written opposition to the Bill pointed out that "[t]he purposes of the R-A Zone are to provide large lot one-family detached dwellings, while encouraging the retention of agriculture as a primary land use; and to encourage the preservation of trees and open spaces." *See also* Zoning Ordinance § 27-426(a).

the uniformity rule. But the uniformity statute contains no exception and Appellees cite no legal authority to support an exception. *See* Land Use § 22-201(b)(2)(i).

Moreover, Appellees' argument ascribes to the District Council a broader scope of authority and responsibility than it legally possesses. The District Council is not tasked with or authorized to regulate airports, even local ones. This responsibility lays with the Maryland Aviation Administration of the Maryland Department of Transportation ("Administration"). A valid airport license or registration is needed to operate an airport in Maryland. Md. Code Regs. (hereinafter "COMAR") 11.03.04.06B.[15] "The Administration may not issue or renew an airport license or registration if operations conducted at the airport seriously impair public safety." COMAR 11.03.04.06A. Dealing with the question of whether a longstanding safety risk at a small airport should be closed is the responsibility of the Administration, not the District Council. Of course, the District Council may consider the existence of an airport in making planning decisions in the process of a comprehensive or sectional rezoning. But in the context of this text amendment, the Council is bound by the uniformity rule. *See* Land Use § 22-201(b)(2)(i).

A Wisconsin court struck down an ordinance allowing property fronting a particular street within an industrial zone to be used as a rendering plant on uniformity grounds. *Boerschinger v. Elkay Enters. Inc.*, 145 N.W.2d 108, 111 (Wis. 1966). "[T]he ordinance

---

[15] The only exemptions to the license or registration requirement are airports owned by the United States, agricultural airstrips used for application of chemicals, fertilizers, or other substances to agricultural or forest lands, balloon glider landing areas, and emergency landing areas. Md. Code, § 5-302 of the Transportation Article; COMAR 11.03.04.09. None of these exemptions apply in this case.

amend[ed] the general zoning ordinance by creating [a paragraph] authoriz[ing] the defendants' land for use as a rendering plant but did not carry over as a similar approval to the remaining three parcels comprising the industrial district." *Id.* at 110. The Supreme Court of Wisconsin explained that "one of the principles of law is that all persons are entitled to equal protection of the law, and any ordinance regulating the use of property must apply equally to all persons under like or similar circumstances. There must be a reasonable basis for different treatment." *Id.*

The Wisconsin court considered significant the absence of any reasons for treating one group of properties within a district differently from others: "[if] the amendment is valid, the owners of the three other parcels in the industrial district would be required to meet [stricter or more onerous] standards to obtain . . . permits [for rendering plants]." *Id.* at 111. The court noted that, like our case, "the record does not disclose any reasonable basis for the different treatment. In fact, no reasons are stated." The *Boerschinger* court concluded that "[t]he amendment to the ordinance is discriminatory since the standards set forth in the ordinance would not apply to defendant owners of the property exempted by the amendment." *Id.*; *see also Berger v. City of Mayfield Heights*, 154 F.3d 621 (6th Cir. 1991) (holding that—in a constitutional challenge to an ordinance requiring that only smaller sized lots must be clear-cut to eight inches— the city did not "successfully articulat[e] any rational basis to justify the onerous requirements imposed on the owners of vacant lots subject to [the ordinance] as opposed to the owners of all other vacant lots"); 1 Arden H. Rathkopf, *et al.*, *Rathkopf's The Law of Zoning and Planning* § 4.5 (4th ed. 2022) ("[I]n establishing boundary lines between districts the legislature must be able to

defend its action by pointing out the relation between their location and the health, safety, morals, or general welfare of the community.").

When we consider the specific criteria set forth in CB-17, the absence of any public purpose for creation of this special high-density area within an R-A zone is even more evident. The first criterion in CB-17 that concerns us is that for an "assemblage of adjacent properties" to qualify for the density allowing townhomes—albeit in the R-A zone—is that the properties must be "entirely within 2,500 feet of land owned by a regulated public utility and used for purposes of electrical generation, transmission, or distribution . . . ." This criterion seems tailor-made for Freeway Airport and leaves us puzzled by how it is reasonably based on a public purpose. During oral argument, when we asked about this criterion, counsel for Freeway Realty, LLC responded that the power line runs right next to the airport and the runway and that the power line is a public safety issue for the airport. This is a candid answer and is consistent with our sense of problems affiliated with owning property near power lines generally. Nevertheless, it does not offer a public policy that is served by the bill and when we review this criterion under the *Woodward & Lothrop* "reasonable and based upon the public policy to be served" standard, it falls short. *See* 280 Md. at 720; *see also Page v. City of Portland*, 165 P.2d 280, 284 (Or. 1946) (en banc) ("While the City Council has wide discretion in enacting zoning ordinances, it has no right or authority to place restrictions on one person's property and by mere favor remove such restrictions from another's property. There must be reasonable ground or basis for the discrimination."). Nor did counsel for the District Council offer any public policy reason for why proximity to a power line reasonably related to a public purpose. We cannot

-19-

conceive of what public policy might be served by requiring that property—to qualify for the special higher-density development—must be within 2,500 feet of land owned by a public utility and used for electrical generation, transmission, or distribution.

The second questionable criterion is that the subject property or properties must be located on an "assemblage of adjacent properties" that "is no less than one hundred (100) acres and no more than one hundred fifty (150) acres in size or was formerly used as an airport." We accept that an upper size limitation can serve a public purpose in that the District Council legitimately might not want such high density to be widespread. A minimum size restriction might also serve a public purpose in that the Council legitimately might seek to avoid a very small cluster of townhomes amidst agriculture and low-density residential properties. We will not second-guess the District Council's selection of maximum and minimum numbers.

Yet we see absolutely no reason why that criterion contains an alternative pathway to qualify—that the land "was formerly used as an airport." Nor have Appellees offered any legitimate reason, either in their briefs or when questioned on the topic at oral argument. The suggestion made by one of Appellees that the criterion has a legitimate purpose because airports are typically of a desirable size does not hold water—considering the specific maximum and minimum acreage set forth in CB-17 that independently addresses the issue of size. It does, however, give Freeway Realty, LLC the option to utilize whatever portion of its land it desires—including a portion less than 129 acres—for higher-density development.

Appellees have offered no recognized public policy, and we see none in the record, that would justify a non-uniform exception allowing assemblages of adjacent properties within the R-A zone to have a much higher density because the acreage is near a power line or utility station. Similarly, singling out former airport property has no apparent public purpose. *Cf. Page*, 165 P. 2d at 283 ("[A] classification made by [an] ordinance will not be changed unless the change is required for the public good . . . . Certainly it cannot be made merely to accommodate private interests detrimental to the welfare of other property owners in the same district."). This criterion fits the Freeway Airport property and is transparently the reason for its inclusion in CB-17. No other airport properties that could qualify under CB-17 are mentioned in the record.[16]

### *Final thoughts*

This case presents a worrisome dynamic between public and private interests. The airport owners have essentially bullied the Council by claiming that—as holders of a nonconforming, allegedly dangerous, airport—they will intensify the usage, making it more dangerous, unless the Council accords them the density of their choice. Yet the District Council may not—under the uniformity rule—single out this airport on grounds that it is a nonconforming use. *See Augenblick*, 104 A.D.2d at 815 (Lazer, J., dissenting)

---

[16] The requirement in CB-17 that the assemblage of properties be within one mile of a municipal boundary may reasonably relate to a public interest in locating higher-density properties close to other high-density properties. Similarly, the requirement that a portion of the assembled properties have frontage on a freeway might also relate to a public purpose considering the higher levels of traffic generated by having more people living in the area.

(holding that it is not reasonable to differentiate between properties due to the existence of a nonconforming use), *rev'd,* 488 N.E.2d 109 (N.Y. 1985).

As the Court of Appeals said in *Rylyns Enters.*, "the requirement of uniformity serves to protect the landowner from favoritism towards certain landowners within a zone by the grant of less onerous restrictions than are applied to others within the same zone elsewhere in the district[.]" 372 Md. at 536. CB-17 allows the Freeway Airport property, which is within an R-A zone, to be developed with a higher density than other properties within the same R-A zone. The record shows that nearby properties, such as the undeveloped land in Waterford Estates, do not meet all the criteria in CB-17 and therefore do not qualify for the higher density.

There are other methods for Freeway Realty, LLC to seek exemption from existing land use regulations other than a text amendment. The Planning Board, in a letter to the District Council, recommended that the airport land go through the Sectional Map Amendment or Zoning Map Amendment process. *See* Zoning Ordinance § 27-220. These are viable options and consistent with testimony by counsel for Freeway Realty, LLC that "the current 2006 Bowie and Vicinity Master Plan places the property in the Developing Tier and calls for moderate density and a need for a diversity of housing types." During the Sectional Map Amendment process, the District Council will consider the Master Plan and various other factors in making its decision. *See* Zoning Ordinance § 27-222.

**CONCLUSION**

We reverse the Circuit Court for Anne Arundel County. The District Council's enactment of CB-17 unlawfully violates the statutorily prescribed uniformity requirement, and therefore is illegal and unenforceable. It shall be stricken in its entirety.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. COSTS TO BE PAID BY APPELLEES.**